CITY OF WALTHAM, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, Defendant,

Town of Lexington, Intervenor.

Civ. A. No. 91–11277–Y.

United States District Court,
D. Massachusetts.

March 2, 1992.

Donald L. Anglehart, Paul J. Murphy, Cuddy, Lynch, Manzi & Bixby, Boston, Mass., John B. Cervone, City of Waltham Law Dept., Waltham, Mass., Glenn A. Wood, McGregor, Shea & Doliner, Boston, Mass., for plaintiff.

Mary Elizabeth Carmody, U.S. Attorney's Office, William L. Lahey, Palmer & Dodge, Boston, Mass., for defendant.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

### I. INTRODUCTION

The City of Waltham ("Waltham") opposes construction of a regional mail processing facility by the United States Postal Service ("Postal Service") at 200 Smith Street, Waltham. Waltham alleges that the Postal Service, in deciding to locate the facility at the Smith Street site, violated substantive and procedural requirements of the Postal Reorganization Act, 39 U.S.C. § 401 (1988), the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 (1988), the Intergovernmental Cooperation Act ("ICA"), 31 U.S.C. § 6506 (1988), the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 (1988), and the Clean Water Act, 33 U.S.C. §§ 1342 and 1344 (1988).

Waltham seeks a permanent injunction against the construction of the facility at this site, or, in the alternative, a temporary injunction against any construction-related activity at the site until the Postal Service:

(1) prepares an Environmental Impact Statement with respect to the facility;

(2) prepares a floodplains-wetlands study and a "no practicable alternative site" analysis;

(3) provides a detailed explanation for all proposed environmental mitigation measures required for the facility; and

(4) grants Waltham access to all Postal Service records related to the siting of the facility.[1]

The Postal Service moves for summary judgment pursuant to Fed.R.Civ.P. 56(b). Waltham opposes this motion and itself moves for summary judgment against the Postal Service. The Town of Lexington, which has intervened in this action,[2] also

---

1. Waltham's Complaint also requests that the injunction be conditioned on the Postal Service granting it access to the site to gather environmental information. Since the filing of the Complaint, the Postal Service has permitted representatives of Waltham to enter the site for this purpose.

2. The City of Waltham and the Town of Lexington are not alone in their attempt to block construction of a postal facility in Waltham. The Postal Workers Union, AFL–CIO ("the Local") also moved to intervene as a plaintiff, citing adverse environmental effects and changed working conditions as constituting a claim of intervention as of right pursuant to Fed.R.Civ.P. 24(a)(2). In the alternative, the Local requested this Court to exercise its discretion to allow intervention pursuant to Fed. R.Civ.P. 24(b).

To establish a claim of right to intervention, one must show some interest in the action which is not adequately represented by the present parties and that the disposition of the action "may ... impair or impede the applicant's ability to protect that interest." Fed. R.Civ.P. 24(a)(2). Consequently, the Local had to show an interest in blocking the construction of the postal facility, not shared with the City of Waltham, which would be affected by the outcome of this case.

The Local failed in this burden. Only two grounds for intervention were proffered: (1) that the new facility would require transfer of postal workers, affecting their work conditions; and (2) that the postal facility would adversely affect the environment.

First, the Local's complaints were not directly related to the construction of the facility itself, but concerned the changed working conditions

opposes the motion by the Postal Service for summary judgment.

## II. FACTUAL BACKGROUND

The Smith Street property consists of two parcels totalling 36.3 acres. Three interconnected commercial buildings totalling 326,902 square feet and associated parking lots are located on the site. It is undisputed that the site contains wetlands. The site's access roads open to the east onto Smith Street, a north-south road running parallel to Route 128. One such access road is approximately two blocks south of the point in Lexington where Smith Street intersects Route 2, a limited access highway running east-west. The other access road is less than a few hundred feet north of the point where Smith Street intersects Trapelo Road which runs east from this intersection into Waltham and west for a few hundred feet to the Route 128 (I–95)—Trapelo Road interchange.

The proposed Northwest Center Mail Processing Center (the "new facility") is one element of the Postal Service "Boston Metro Plan" to improve regional postal service by modernizing operations at the Boston General Mail Facility (the "General Mail Facility") and by transferring operations from that facility to regional mail processing centers in Brockton, Worcester, and a northwest suburban site. The Postal Service has determined that the General

Mail Facility is incapable of meeting expected increases in mail volume due to space and layout inadequacies and the anticipated disruption of access to and from the General Mail Facility as a result of the commencement of two major highway construction projects in downtown Boston. Upon completion, the new facility will encompass an approximately 406,000 square foot enclosed area and will process mail originating from thirty-four zip code 021 Boston stations and destined for twenty-four zip code 021 Boston stations.

In 1988, the Postal Service commenced its search for a location suitable for the new facility. The Postal Service determined that the preferred location should be somewhere within the area along Route 128 bounded by Lexington to the north and Needham to the south. By August, 1989, the Postal Service narrowed its list of potential sites to four locations in Waltham, and convened a site selection committee to evaluate these four. One site was eliminated because of difficulties in negotiating a sale or lease with its owner, the General Services Administration (the "GSA"). Of the other three, the committee selected the Smith Street property as the preferred site.

The Postal Service then employed an environmental consulting firm, Rizzo Associates, to conduct an Alternative Site Environmental Analysis (the "Alternative Site Analysis") of the three remaining sites.[3]

---

of the postal workers, such as increased employee travel time, employee lateness, and absenteeism. These issues " 'vitally' affect the 'terms and conditions of employment,' " and fall squarely within the mandatory subject matter of the collective bargaining agreement with the Postal Service. *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 176, 92 S.Ct. 383, 396, 30 L.Ed.2d 341 (1971) (quoting 177 N.L.R.B. 915 (1969); *see also First Nat'l Maintenance Corp. v. N.L.R.B.,* 452 U.S. 666, 676–80, 101 S.Ct. 2573, 2579–81, 69 L.Ed.2d 318 (1981); *Soule Glass and Glazing Co. v. N.L.R.B.,* 652 F.2d 1055, 1085–86 (1st Cir.1981). A local cannot negotiate terms and conditions of employment unless it is a signatory to that agreement or has received the permission of the National Union. The Local fulfilled neither of these requirements. *See Baton Rouge Bldg. and Constr. Trades Council, AFL–CIO v. Jacobs Constr., Inc.,* 804 F.2d 879, 882 (5th Cir.1986); *Pittsburgh Metro Area Postal Workers Union v. United States*

*Postal Serv.,* 463 F.Supp. 54, 55–56 (W.D.Pa. 1978), *aff'd,* 609 F.2d 503 (3d Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980).

Finally, the Local failed to show any injury-in-fact by virtue of its environmental concerns that differed from the interests already presented by Waltham. These important environmental concerns are more than adequately represented by counsel for Waltham; indeed, Waltham's interest in the environmental impact of this facility far outweighs the generalized interest of the postal workers. Accordingly, the Motion to Intervene as Plaintiff by the Local was denied.

3. The site selection process appears relatively straightforward from the point at which the Postal Service narrowed the field to three alternative sites and commissioned Rizzo Associates to conduct an analysis of them. The relevant issues presented in this case concern only the steps taken from this point onward. It should be noted, however, that the precise steps of the

This analysis, dated December 29, 1989, compared the three sites in terms of potential problems regarding hazardous waste, wetlands, stormwater management, traffic, construction costs, and time delay. Based on environmental and cost comparisons, it concluded that the Smith Street site was the preferred site.

On February 26, 1990, the Postal Service and Cabot, Cabot, and Forbes, the owner of the Smith Street site, entered into a purchase agreement for the site. This agreement was a conditional agreement authorizing the Postal Service to purchase the property for $38 million by November 30, 1990. In the interim, the Service agreed to make monthly option payments starting in May, 1990, totalling $2,400,000, of which $400,000 were non-refundable.

On May 15, 1990, the Postal Service released a "Site Planning Report, Environmental Assessment" (the "Initial Assessment"), evaluating the environmental issues related to developing the Smith Street site.[4] On June 26, 1990, the Postal Service held a public hearing in Waltham at the Smith Street site concerning the proposed new facility. Approximately 150 persons attended, the majority of whom voiced strong opposition to the proposal. Opposition focused on the proposed facility's traffic, noise, air, water quality, and tax revenue impacts.

In September, 1990, the Postal Service released an updated environmental assessment entitled "Site Planning Report, Updated Environmental Assessment" (the "Updated Assessment"). The Updated Assessment, designed to supersede the Initial

Assessment, addressed concerns raised regarding air, traffic, water quality, and noise impacts. It also evaluated the environmental impacts of a significant project design change involving greater use of the existing buildings on the site.

Correspondence in October, 1990, expressed continued opposition to the proposed siting by the Mayor and City Council of Waltham as well as by Lexington and Waltham neighborhood associations. A Waltham City Council resolution requested a public hearing on the Updated Assessment, but the Postal Service denied this request.

On November 6, 1990, the Board of Governors of the United States Postal Service gave its approval for the purchase of the Smith Street property to be used for the new facility. On November 9, the Postal Service issued a Finding of No Significant Impact (the "FONSI") based on the Updated Assessment. Waltham, alleging that the Board of Governors was given false information about the Smith Street site and alternative sites, requested that the Board reconsider this approval. However, at its December meeting, the Board declined to reconsider its decision. Thus, on December 20, 1990, the Postal Service acquired title to the Smith Street property.

On May 7, 1991, Waltham filed the action for declaratory and injunctive relief. In June, 1991, the Postal Service released its "Amendment to the Updated Environmental Assessment" (the "Amended Assessment"). The Amended Assessment had two stated purposes: to address environ-

site search prior to this point are not entirely clear from the record.

The Postal Service Decisional Analysis Report, dated September 5, 1990, states that its real estate consultant search identified 12 candidate properties and that "a number of additional sites were located through field research." Eight of these were eliminated by an initial evaluation. A site selection committee convened in August, 1989, evaluated the four remaining sites. In contrast, the Postal Service Updated Environmental Assessment, dated September 1990, states that twenty-two sites were considered and narrowed to three.

Neither of these reports mentions that in 1988 an environmental assessment (the Berger Environmental Assessment) was conducted regarding the GSA site. This suggests that the Postal Service site selection process had narrowed down the alternatives well before August, 1989. The Court rules, however, that this ambiguity is irrelevant to determining whether the Postal Service's selection and environmental review of the Smith Street site meets the required statutory standards. As explained later in this opinion, the Court will not treat the Berger Environmental Assessment as part of the administrative record. See infra Part IV.C.2. and n. 12.

4. The Initial Assessment and the two subsequent environmental assessments were performed by Rizzo Associates.

mental issues raised since the release of the Updated Assessment (particularly concerning traffic, wetland, floodplain, and stormwater impacts) and to describe and evaluate design changes not anticipated when the Updated Assessment was completed. The Amended Assessment concluded that its analysis supported the FONSI issued the previous November.

### III. WALTHAM'S CLAIMS

Waltham contends that the siting of the new facility at 200 Smith Street will have serious detrimental impacts on wetlands, drinking water quality, traffic, public safety, residential areas, and tax revenues, thus irreparably harming the City and its residents. The central allegations of its Complaint are that the Postal Service violated mandatory environmental, wetlands, and intergovernmental review procedures by:

(1) pre-selecting the Smith Street site without ever completing a mandatory wetlands study and a mandatory "no practicable alternatives" analysis, and before completing its environmental review;

(2) using the illegal criterion of "political feasibility" as a primary factor in its site selection decision;

(3) making repeated misrepresentations regarding the site selection process to local officials, denying them access to relevant public records, and failing to solicit and consider adequately public input regarding the site selection and environmental review process;

(4) failing to consider adequately in its three Environmental Assessments the proposed facility's environmental impacts at the Smith Street site relative to other alternative sites; and

(5) relying on inadequate and undefined environmental mitigation measures in concluding that the new facility would not have a substantial impact on the environment.

These allegations provide the basis for four somewhat overlapping counts. Count I alleges that the conduct of the Postal Service violated its own environmental review regulations adopted pursuant to the Postal Reorganization Act. 39 U.S.C. § 401. Count II alleges that this conduct violated NEPA, 42 U.S.C. § 4332, and its implementing regulations. Count III alleges that the Postal Service violated the ICA. 31 U.S.C. § 6506. Count IV alleges that the Postal Service failed to comply with the Clean Water Act. 33 U.S.C. §§ 1342 and 1344. The Court's analysis will address Counts I and II first because these constitute Waltham's central claims. The Court then will examine Counts III and IV.

### IV. COUNTS I AND II: THE POSTAL REORGANIZATION ACT AND NEPA CLAIMS [5]

Waltham makes two basic contentions in Counts I and II. First, Waltham claims that the Postal Service should have prepared an Environmental Impact Statement concerning its proposed construction of the new facility at the Smith Street site, and argues that the Postal Service Finding of No Significant Impact violated both NEPA and the Postal Service regulations under the Postal Reorganization Act because the Environmental Assessments supporting it failed to adequately consider the environmental impacts of the project. In essence Waltham challenges the substantive adequacy of the Environmental Assessments and the FONSI.

---

5. The Court will examine together the Count I Postal Reorganization Act claim and the Count II NEPA claim because these claims overlap to such a large extent. As explained *infra* in Part V.A., the Postal Service promulgated its own environmental review regulations to implement NEPA. These regulations establish procedures consistent with NEPA and the NEPA implementing regulations issued by the Council on Environmental Quality. However, the Postal Service NEPA regulations state that they are issued un-

der the Postal Reorganization Act to the extent that Act otherwise exempts the Postal Service from NEPA. Thus Waltham, in Count I, claims that the Service has violated its regulations as issued under the Postal Reorganization Act and, in Count II, claims that the Service has violated the requirements of NEPA. For the most part, however, the Postal Service's obligations are the same under NEPA as under the Postal Reorganization Act.

Second, Waltham claims that the failure of the Postal Service to follow the requirements mandated by NEPA and by its own environmental review regulations under the Postal Reorganization Act fatally flawed the Postal Service Environmental Assessment/FONSI process. In essence, Waltham challenges the procedural adequacy of the Environment Assessment/FONSI process carried out by the Postal Service.

Before evaluating these arguments, the Court will lay out the relevant legal framework under NEPA and will explain the applicable standard of judicial review.

A. *The Legal Framework under NEPA and the Postal Reorganization Act.*

The Supreme Court has summarized the purposes of the National Environmental Policy Act as follows:

> The sweeping policy goals ... of NEPA are ... realized through a set of "action-forcing" procedures that require that agencies take a "hard look at environmental consequences," and that provide for broad dissemination of relevant environmental information. Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989) (citations omitted). Consistent with this view, the First Circuit has stated:

NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account.

*Massachusetts v. Watt,* 716 F.2d 946, 952 (1st Cir.1983).

To accomplish this purpose, NEPA requires that federal agencies prepare an Environmental Impact Statement on any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An Environmental Impact Statement is a "detailed statement" examining in depth the environmental impact of the proposed action and alternatives to the proposed action. *Id.*

NEPA also created the Council on Environmental Quality (the "Council") and authorized the Council to establish regulations setting forth environmental review procedures to be followed by federal agencies. *See* 42 U.S.C. §§ 4342 and 4344 (1988). Pursuant to its authority, the Council has promulgated detailed regulations setting forth when a federal agency must prepare a full Environmental Impact Statement or the less extensive Environmental Assessment and what must be included in each. *See* 40 C.F.R. §§ 1501.3, 1501.4, 1502.1–.25, 1508.9, 1508.11, and 1508.13 (1991).[6]

To implement the Council's NEPA regulations, the Postal Service adopted regulations, Postal Service Environmental Procedures, 39 C.F.R. § 775 (1990), which establish the Postal Service procedures for complying with NEPA.[7] These procedures are

---

6. The regulations promulgated by the Council to implement NEPA state that an Environmental Assessment is to be "a concise public document" which "briefly provide[s] sufficient evidence and analysis" on which to determine whether an Environmental Impact Statement is necessary. 40 C.F.R. § 1508.9.

7. 39 C.F.R. § 775.1, entitled "Purpose", states:
These procedures implement the National Environmental Policy Act (NEPA) Regula-

tions (43 FR 55978) issued by the Council on Environmental Quality (CEQ). These procedures are adopted pursuant to the Postal Reorganization Act rather than the NEPA insofar as the NEPA and its Regulations do not apply to the Postal Service under 39 U.S.C. § 410(a).
Under the Postal Reorganization Act, the Postal Service, as an "independent establishment of the executive branch", is exempt from complying with some federal laws. 39 U.S.C.

consistent with the requirements set forth in the Council's NEPA regulations. Under the Postal Service environmental review procedures, an Environmental Assessment must be prepared for the construction of any new facility involving more than 30,000 net interior square feet. 39 C.F.R. § 775.4. The Environmental Assessment must be prepared once the contending sites are identified and the completed Environmental Assessment must be used in the selection of the final site. 39 C.F.R. § 775.6(b)(1). It must contain:

(1) a summary of major considerations and conclusions;

(2) a description of the proposed action; and

(3) for each reasonable alternative, a description of the affected environment, the environmental consequences, the mitigation measures, if any, and a comparison to all alternatives considered.

39 C.F.R. § 775.7(a).

If the Postal Service determines, based on the Environmental Assessment, that the proposed action has no significant impact on the human environment, an Environmental Impact Statement need not be prepared. Instead, the Service prepares and publishes a "Finding of No Significant Impact" (FONSI). The FONSI must briefly present reasons why an action will not have significant impact on the human environment and state that an Environmental Impact Statement will not be prepared. 39 C.F.R. § 775.6(a)(2).

## B. *The Standard of Review.*

Waltham claims that the Postal Service FONSI and the Environmental Assessment upon which it is based violated NEPA because they failed substantively to address,

identify, and mitigate the environmental impacts of the proposed project and because, in carrying out the Environmental Assessment and issuing the FONSI, the Postal Service did not follow required procedures. Both Waltham and the Postal Service seek summary judgment on these claims.

In reviewing agency decisions not to prepare an Environmental Impact Statement, the First Circuit has described the appropriate standard of judicial review as follows:

We have previously said that one challenging a decision *not* to prepare an [Environmental Impact Statement] must show a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" *Quinonez–Lopez v. Coco Lagoon Development Corp.,* 733 F.2d 1, 2 (1st Cir. 1984).... If the record reveals such a "substantial possibility" with sufficient clarity, the agency's decision (not to produce an [Environmental Impact Statement]) violates NEPA. Depending upon the agency's reasons, a reviewing court might say that such an agency made a mistake interpreting NEPA or the [Council's] regulations, or the court might say that the agency's "no signficant impact" finding was simply "arbitrary, capricious, an abuse of discretion," 5 U.S.C. § 706(2)(A). Often these questions cannot be easily separated from one another. But whatever verbal formulation it applies, the court in a case like this must essentially look to see if the agency decision, in the context of the record, is too "unreasonable" (given its statutory and factual context) for the law to permit it to stand.

§§ 201 and 410(a) (1988). The language of 39 C.F.R. § 775.1 suggests that under the Postal Reorganization Act the Postal Service is not obligated to follow NEPA. However, there are some strong precedents holding that the Postal Reorganization Act does *not* exempt the Postal Service from NEPA and that the Postal Service was obligated to promulgate its NEPA regulations. *See Chelsea Neighborhood Ass'ns v. United States Postal Serv.,* 516 F.2d 378 (2nd Cir. 1975); *City of Rochester v. United States Postal Serv.,* 541 F.2d 967 (2nd Cir.1976).

Furthermore, the Postal Service here does not contend that the Postal Reorganization Act exempts it from NEPA's requirements. While the Postal Service does contend that other Postal Service regulations relevant to Waltham's claims under Counts I and III do *not* create a private right of action, the Service does not dispute that its NEPA regulations in 39 C.F.R. § 775 are privately enforceable.

*Sierra Club v. Marsh*, 769 F.2d 868, 870 (1st Cir.1985). "Thus it is clear that the reviewing court's function is not to second-guess the choices made by government officials, but rather to assess their process of arriving at those choices." *Town of Norfolk v. United States EPA*, 761 F.Supp. 867, 873 (D.Mass.1991) (Mazzone, J.).

In essence, the First Circuit sees two aspects to a court's review of agency decisions under NEPA. First, the reviewing court must conduct a substantive review of the agency's action under section 706 of the Administrative Procedure Act to ensure that the decision was not arbitrary and capricious. Second, the court must review whether the agency has complied with the duties, or procedural requirements, which NEPA places upon it. *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir.1980); *Town of Norfolk*, 761 F.Supp. at 873.

With respect to the content of the first prong of this review, the Supreme Court has made clear that, in conducting an "arbitrary and capricious" review of agency decisionmaking under section 706(2)(A) of the Administrative Procedure Act, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Applying this principle to its

review of an agency's Environmental Impact Statement, the First Circuit has stated, "[t]his [administrative] record contains the more detailed studies and background of deliberation which form the basis of the final [Environmental Impact Statement]. We think that the law requires production of the entire administrative record." *Silva v. Lynn*, 482 F.2d 1282, 1283 (1st Cir.1973) (citations omitted).

In the summary judgment context, the Court must determine whether "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In a NEPA case, the Court should grant summary judgment for the defendant agency unless the Court's review of the record reveals that the plaintiff has discovered therein a genuine issue of material fact as to whether the agency's decision was arbitrary and capricious or otherwise an abuse of discretion. *Town of Norfolk*, 761 F.Supp. at 873–74 (citing *Concerned Citizens on I–190 v. Secretary of Transp.*, 641 F.2d 1, 7 [1st Cir.1981]).

The Court notes that the submissions of the parties make so many fundamentally contradicting factual claims "that one is tempted to think some 'material' factual issue must be in dispute...." *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 461 (1st Cir.1989).[8] The Court must

---

**8.** Waltham, in its final Supplemental Memorandum, asserts that it is entitled to summary judgment because the Postal Service, having failed to oppose Waltham's Local Rule 56.1 Statement of Uncontested Facts, is deemed to have accepted these facts. This is hardly a frivolous point. If Waltham is right that the Postal Service is deemed to have accepted Waltham's version of the facts, then it would appear that there is no genuine dispute of material fact and Waltham may very well be entitled to summary judgment as matter of law.

Local Rule 56.1 states in pertinent part:

Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving part contends there is no genuine issue to be tried.... Failure to include such a statement constitutes grounds for the denial of the motion. Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be

tried.... Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

In accordance with Local Rule 56.1, the Postal Service included the required statement of material facts with its motion for summary judgment. Likewise, in accordance with the rule, Waltham, with its Memorandum in Support of its Motion for Summary Judgment and in Opposition to the Service's Motion for Summary Judgment, included its statement of material facts which both denied much of the Postal Service's Local Rule 56.1 statement and alleged many additional facts as well. In fact, Waltham filed two nearly identical Local Rule 56.1 statements with the Court; the Postal Service did not include another Local Rule 56.1 statement with its Memorandum in Reply to Waltham's Opposition and in Opposition to Waltham's Summary Judgment Motion. Therefore, Waltham con-

determine, however, whether there are any such disputes of material fact which have a basis in the administrative record. *See Id.; see also Town of Norfolk*, 761 F.Supp. at 874.[9]

## C. *The Administrative Record.*

Before the Court can review the substantive and procedural adequacy of the disputed FONSI, it must establish what constitutes the record upon which it will make its review. Waltham and the Postal Service disagree as to what should be included in the record. The Postal Service states that the administrative record consists of thirty-seven documents listed in the Affidavit of Kenneth Perrin, the General Manager of the Postal Service Real Estate Division in the Northeast Region. Opposition of the Postal Service to Plaintiff's Motion for Summary Judgment at 3.[10]

Waltham has filed a motion in limine to strike the Amended Assessment from the record. Waltham also contends that the administrative record should include the so-called Berger Environmental Assessment, an environmental assessment prepared in November 1988 for the GSA site, a site in Waltham which was considered by the Postal Service in 1988. The Postal Service contends that the Amended Assessment

should be considered part of the record, but that the Berger Environmental Assessment should not. The Postal Service further argues that the affidavits Waltham submitted with its cross-motion for summary judgment are "extra-record" affidavits and should not be reviewed by the Court.[11] Finally, Waltham requests that the Postal Service be compelled to produce "over two filing cabinets full" of additional materials allegedly compiled by it during its site selection process.

■ Before addressing the specific issues, the Court will summarize the relevant law concerning what constitutes the administrative record and when a court may consider additional extra-record information. As a general rule, the reviewing court should define the administrative record as the record that was before the agency at the time it made the decision in issue. *See Camp*, 411 U.S. 138, 93 S.Ct. 1241; *Aldridge*, 886 F.2d at 460. This record "consists of all documents and materials directly or indirectly considered by agency decision-makers[.]" *Towns of Norfolk and Walpole v. United States Army Corps of Eng'rs*, 137 F.R.D. 183, 185 (D.Mass.1991) (quoting *National Wildlife Fed'n v. Bur-*

---

tends that its version of the facts, as stated in its Local Rule 56.1 statement, should be deemed accepted by the Postal Service.

Waltham's approach is overly formalistic. Waltham used virtually the identical Local Rule 56.1 statement both for the purposes of its opposition to the Postal Service summary judgment motion and its own cross-motion. Under these circumstances, the Postal Service's initial Local Rule 56.1 statement suffices for both purposes as well.

**9.** This Court has tried to follow the approach taken by Judge Mazzone, who noted in reviewing a summary judgment motion in a NEPA case:

> In reviewing this motion, I have closely read the briefs and have endeavored "to track those divergent claims to their sources in the record." [*Aldridge*, 886 F.2d at 460] Furthermore, I am mindful of the fact that the Towns, understandably, have subjected the [Environmental Impact Statement] to intense scrutiny, and "of the tendency of such searching scrutiny to magnify retrospectively any possible defect." *Concerned Citizens on I-190*, 641 F.2d at 5.

*Town of Norfolk*, 761 F.Supp. at 874.

**10.** The Court notes that the Perrin Affidavit actually lists thirty-eight documents as comprising the administrative record, but it lists twice the Postal Service's September 5, 1990 Decision Analysis Report.

**11.** The affidavits the Postal Service considers "extra-record" are the Daylor, Campbell, Vokey, White, and Cervone affidavits. In addition it should be noted that the Postal Service makes a separate and particular argument for striking all of the Cervone affidavits from the record. Attorney Cervone works in the Waltham Solicitor's Office. The Postal Service contends that because his affidavits necessarily make Cervone "both a fact and an expert witness," Disciplinary Rule 5–102 and Massachusetts case law applying DR 5–102 require that he withdraw from representing Waltham in this case or that his affidavits be removed from the record. *See* Model Code of Professional Responsibility DR 5–102 (1980). This Court expresses no opinion on this issue because it does not affect the ultimate disposition of the case.

*ford,* 677 F.Supp. 1445, 1457 [D.Mont. 1985]).

■ There are a number of exceptions to the general rule. In certain situations a reviewing court should review additional evidence which is not part of the administrative record. For example, "the court is justified in looking past the administrative record when bad faith is claimed." *Id.* at 188 (citation omitted). In addition, in reviewing an agency decision under NEPA, a court may consider evidence "tending to show significant impacts or realistic alternatives that the responsible officials ignored." *Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 72 (D.C.Cir.1987) (citation omitted). *Accord Conservation Law Found. v. Clark,* 590 F.Supp. 1467, 1474–75 (D.Mass.1984). Judge Mazzone has summarized some other such exceptions:

> These situations include ... when new information that confirms or contradicts agency predictions becomes available, when the evidence indicates that the agency relied on secret sources unavailable for public scrutiny, or when the plaintiff presents previously available evidence that the agency should have considered but did not.

*Town of Norfolk,* 761 F.Supp. at 874 (citations omitted).

### 1. The Amended Assessment.

■ Waltham contends that the Amended Assessment, prepared seven months *after* the Postal Service FONSI and a month *after* the commencement of this litigation is legally inadmissible as part of the administrative record. Waltham's Memorandum in Support of Its Motion for Summary Judgment at 10–11. It presents two arguments to support this contention. First, Waltham argues that the Amended Assessment was never circulated for public comment and therefore does not meet NEPA's requirements of full public disclosure. Waltham cites two First Circuit cases as support for this principle, *Massachusetts v. Watt,* 716 F.2d at 951, and *Grazing Fields Farm,* 626 F.2d at 1073. Both of these cases, however, are distinguishable from this case. In both, the issue was whether

uncirculated studies could legally support a previously issued Environmental Impact Statement. Under NEPA and the Postal Service's own regulations, the public disclosure requirements are far greater for an Environmental Impact Statement than for an Environmental Assessment. The former must be circulated for public comment for a minimum of thirty days before the agency may make a decision based upon it. 39 C.F.R. § 775.9. Likewise, any supplement to an Environmental Impact Statement must undergo the same comment period before the agency can make a decision based on the supplement. 39 C.F.R. § 775.8(f). In contrast, while the Postal Service is required to make public an Environmental Assessment, it is not required to observe any comment period prior to issuing a FONSI based on any such assessment, nor is there any mandatory comment period for the FONSI during which the Service must refrain from taking further action. *See* 39 C.F.R. §§ 775.6(a)(2), 775.7, and 775.10. Thus the fact that the Amended Assessment has not been submitted to a process of public comment is not sufficient reason to exclude it from the administrative record.

Waltham's second reason for excluding the Amended Assessment from the administrative record is much stronger. Waltham argues that the record must be limited to those documents that the Postal Service had in front of it at the time the decision (the FONSI) was made and which were considered in the decisionmaking. It argues that the Amended Assessment, as a post hoc justification of the FONSI, should be excluded from the record. Waltham cites Judge Mazzone's holding in *Towns of Norfolk and Walpole v. Army* that "the administrative record 'is that which was before the agency at the time the decision being reviewed was made, and it consists of all documents and materials directly or indirectly considered by agency decisionmakers[.]'" *Towns of Norfolk and Walpole,* 137 F.R.D. at 185 (quoting *National Wildlife Fed'n v. Burford,* 677 F.Supp. at 1457.

The Postal Service offers two arguments for why the Amended Assessment should be considered by the Court as part of the record. Memorandum in Opposition to Waltham's Motion for Summary Judgment at 11. First, the Postal Service states that the Amended Assessment should not be excluded as a "post hoc rationalization" because the Postal Service had no duty to complete its environmental assessment prior to beginning construction. Instead, the Postal Service contends that the Amended Assessment should be seen "as part of an on-going environmental analysis during the design phase and prior to the beginning of the project." *Id.* Second, the Postal Service states that to exclude the Amended Assessment from the administrative record would discourage precisely the sort of agency responsiveness to the public's environmental concerns which NEPA seeks to encourage.

Some fairly broad policy implications arise should this Court include the Amended Assessment in the record. Would such a decision encourage an agency to do shoddy environmental assessments to justify a dubious FONSI since the agency knows it can always prepare an amended assessment if the public takes it to court? On the other hand, would excluding the Amended Assessment from the record serve to discourage agencies from continuing to engage in give-and-take dialogue with the community after releasing a FONSI or after litigation is commenced?

■ Given the arguably post hoc quality of the Amended Assessment, issued after the FONSI was initially made and after Waltham filed suit, the Court ought adopt a more critical view of the Amended Assessment. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (holding that affidavits prepared for trial constitute "post hoc rationalizations" and should be viewed critically); *see also, Louisiana v. Lee*, 758 F.2d 1081, 1085 (5th Cir. 1985) (quoting *Overton Park* and holding that a subsequently prepared Environmental Assessment was "to some extent ... a post hoc rationalization and thus must be

viewed critically"); *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423, 434 (5th Cir.1985) (holding that studies and other evidence made or offered in support of the decision not to prepare an Environmental Impact Statement, but after that decision was made, must be viewed critically). This Court will follow the lead of the Fifth Circuit. That is, while the Amended Assessment will not be considered part of the administrative record, this Court, in the exercise of its discretion, will consider it, albeit critically, as a supplement to the administrative record, to evaluate better the record which led to the decision under review. To exclude the Amended Assessment altogether would be to apply an overly formalistic approach to the Environmental Assessment/FONSI process. Waltham challenges the Postal Service decision not to prepare an Environmental Impact Statement. That decision was first expressed in the September 1990 FONSI. The Amended Assessment is the functional equivalent of a supplemental FONSI. This Amended Assessment, prepared in response to design changes, to public criticisms, and probably to the commencement of this litigation, evaluated environmental impacts not previously addressed adequately and concluded that the earlier FONSI was still justified. Perhaps the Postal Service should formally have released another FONSI instead of simply concluding within the Amended Assessment that the FONSI was justified, but the publication requirement is no different for a FONSI than for an Environmental Assessment, and neither requires a public comment period. Therefore, in reviewing whether the Postal Service decision not to prepare an Environmental Impact Statement was arbitrary and capricious in violation of the Postal Reorganization Act and NEPA, the Court will evaluate the administrative record in light of the Amended Assessment.

2. The Berger Environmental Assessment.

■ The Berger Environmental Assessment is an environmental assessment of the so-called GSA site in Waltham. It was

prepared by Louis Berger & Associates, Inc. and presented to the Postal Service on November 11, 1988. The Postal Service list of materials relied upon in its Environmental Assessment/FONSI process does not include the Berger Environmental Assessment. *See* Perrin Aff.

Waltham contends that the Berger Environmental Assessment should be considered part of the administrative record because it involves the consideration of an alternative site for the new facility and was prepared as part of the overall process through which the Smith Street site was selected. Furthermore, Waltham notes that all three subsequent Environmental Assessments cite the Berger Environmental Assessment in their tables of "References and Communications". Response/Opposition to Defendant's Request for A Ruling to Limit the Scope of the Administrative Record and Exclude the Berger Environmental Assessment at 3.

The Postal Service disagrees. It states that the GSA site was considered and abandoned before the Smith Street site was ever considered, and was abandoned solely because the GSA decided it would not sell the site. Furthermore, the Postal Service states that it did not consider the Berger Environmental Assessment in its Environmental Assessment/FONSI decisionmaking process regarding the Smith Street site. Submission of the Berger Report by the Defendant United States Postal Service at ¶¶ 2–6.

The evidence before the Court indicates that the Postal Service considered the GSA site in 1988 and abandoned it as a possible site due to difficulties in negotiating its sale by the GSA which owned the property. *See* Updated Assessment, Pl's. Ex. 1–A at 23. Thus it is clear that the Berger Environmental Assessment, dated November 1988, was prepared *prior* to the August 1989 convening of a site selection committee which identified three alternative sites,

one of which was the Smith Street property and none of which was the GSA site. Nevertheless, there is no question that the Berger Environmental Assessment must be considered part of the administrative record if the Postal Service directly relied upon it in deciding upon the Smith Street site. The Postal Service contends it did not. The Court's examination of the Berger Environmental Assessment and the subsequent Environmental Assessments reveals no evidence that the Berger Environmental Assessment was relied on directly in the selection of the Smith Street site. Most importantly, the Berger Environmental Assessment makes no mention of the Smith Street site or of the other two final alternative sites over which the Smith Street site was selected.

Even if the Postal Service did not directly rely on the Berger Environmental Assessment, this document may be considered part of the administrative record if the Postal Service decisionmakers "indirectly" considered it. *See Towns of Norfolk and Walpole*, 137 F.R.D. at 185. This is not to suggest, however, that the record must contain all documents on which the Postal Service consultants relied in creating the documents on which the Postal Service itself relied. *See Town of Norfolk*, 761 F.Supp. at 876. The Court's "objective should be to develop an administrative record which is self-sufficient for adequate judicial review." *Silva v. Lynn*, 482 F.2d at 1284. It is true that the three subsequent Environmental Assessments prepared by Rizzo Associates refer to the Berger Environmental Assessment in their tables of "References and Communications." Nevertheless, to hold solely on the basis of these references that the Postal Service Environmental Assessment/FONSI process with respect to these three sites "indirectly considered" the Berger Environmental Assessment would constitute far too broad a definition of that phrase.[12] Inclusion of the

---

12. Waltham correctly notes that the Postal Service itself cited the Berger Environmental Assessment as a reference in the Initial Assessment, the Updated Assessment, and the Amended Assessment. Pl.'s Ex. 1–A at 165; Pl.'s Ex. 2–A at 845, Def.'s Ex. D–1 at 243. But there are

numerous other interviews, studies, and written materials which are not before the Court and which are also cited in the tables of "References and Communications" of each of the Environmental Assessments. While Waltham has contended that the Postal Service should be com-

Berger Environmental Assessment is not necessary for purposes of conducting an "adequate review" of the Postal Service decision to build at the Smith Street site. Therefore the Berger Environmental Assessment is not to be treated as part of the administrative record.

### 3. Waltham's Summary Judgment Affidavits.

 The Postal Service argues that the affidavits submitted by Waltham with its motion for summary judgment are "extra-record" and therefore should not be considered by the Court. The Postal Service correctly notes that in applying the Administrative Procedure Act section 706(2)(A) standard of review, "the focal point [is] the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. at 142, 93 S.Ct. at 1244. This standard precludes the Court from substituting its judgment for that of the agency. *See Citizens to Preserve Overton Park,* 401 U.S. at 413–14, 91 S.Ct. at 822–23. The Postal Service contends that if the Court admits and reviews these affidavits, it will be violating this deferential standard

by substituting its judgment for that of the agency.

The Court does not agree. These affidavits certainly are not part of the administrative record. They were not presented until *after* the release of the Amended Assessment. Waltham, however, is "entitled to introduce evidence tending to show significant impacts or realistic alternatives that the responsible officials ignored...." *Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 72 (D.C.Cir.1987) (citing *Izaak Walton League of Am. v. Marsh,* 655 F.2d 346, 369 n. 56 [D.C.Cir.], *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 [1981]).[13] Most of these affidavits allege facts which purport to show that the Postal Service failed to consider certain aspects of the environmental impact at the Smith Street site or never adequately considered alternative sites. The Court will review the affidavits which meet this requirement, but will not consider those parts of affidavits which offer legal conclusions or present opposing scientific determinations regarding environmental concerns the Postal Service addressed in its Initial and Updated Environmental Assessments.[14]

pelled to produce "two filing cabinets full of material" compiled during the Environmental Assessment/FONSI process, it has not specifically requested that any of the other unproduced documents referenced in the Environmental Assessments be considered part of the record. The Court is not obligated to review any of these materials as part of the administrative record since to do so here would cast the net far too broadly and eviscerate the concept of a finite and cognizable administrative record.

13. It is worth noting at least one other legal basis for looking beyond the administrative record. Courts have suggested that their Section 706 arbitrary and capricious review should be extended beyond the administrative record where "there was bad faith or irregularity in the permit process." *Towns of Norfolk and Walpole,* 137 F.R.D. at 187.

As the review of the Postal Service procedures indicates, *infra,* at Part V.E. and VI, it did fail to comply with some mandated procedural requirements. These violations are not sufficient, however, to constitute "bad faith" or "irregularity". Waltham does not argue to the contrary.

14. The following affidavits merit review. The Daylor affidavit presents wetland and stormwa-

ter issues which it alleges were not considered. The Campbell and Cervone affidavits present traffic issues they contend were neglected. The Vokey affidavit presents issues relative to noise and to alternative sites that allegedly were not considered. The Uhlir affidavit presents facts suggesting that alternative sites were not adequately considered. The White affidavit alleges facts which suggest that the Postal Service did not communicate with and consider the views of the Town of Lexington. The Willmer affidavit, which presents legal opinions and conclusions, will not be considered by the Court.

It should be stressed that the Court's review of these documents is limited to their proffer of evidence as to environmental aspects and alternatives *not* considered adequately or at all by the Postal Service. The Court will review whether the Postal Service considered relevant environmental impacts and alternatives, but the Court will not substitute its judgment for the agency's on scientific determinations. Therefore, the Court will not consider the parts of these affidavits which seek to offer alternative scientific conclusions regarding environmental concerns that the Postal Service did examine.

4. Waltham's Request for Additional Discovery.

Waltham also requests that the Court compel the Postal Service to produce "two filing cabinets full" of material compiled in the course of the Environmental Assessment/FONSI process.[15] The Postal Service contends that it has produced all documents upon which its decisionmakers relied and that no other material should be considered part of the administrative record.

■ In determining whether the Court should compel the production of the material in issue, the Court must keep in mind that the purpose of the administrative record is to assure that a reviewing court has an adequate basis for determining whether an agency's decision is arbitrary and capricious. *See Town of Norfolk*, 761 F.Supp. at 874. The Postal Service has produced a list of thirty-seven documents which it contends comprise the administrative record. Perrin Aff. All of these documents are before the Court and review of this record indicates that it is more than sufficient to provide an adequate basis for determining whether the decision to site the new facility at the Smith Street property was arbitrary and capricious. *See infra* Part IV.D. Therefore the Court holds that Waltham has not established any genuine issue of material fact concerning whether the Court has the full administrative record before it. The motion to compel the Postal Service to produce additional documents is denied.[16]

D. *The Substantive Adequacy of the FONSI.*

■ With the administrative record established, the Court turns to matters of substance. In assessing the substantive adequacy of an agency's FONSI, the essen-

tial test in this Circuit is whether the plaintiff has shown the existence of a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" *Sierra Club v. Marsh*, 769 F.2d at 870 (quoting *Quinonez–Lopez v. Coco Lagoon Dev. Corp.*, 733 F.2d 1, 2 [1st Cir.1984]). If the Court finds that the record reveals "such a 'substantial possibility' with sufficient clarity, the agency's decision (not to produce an [Environmental Impact Statement]) violates NEPA." *Id.* This standard of review is "restrained, but not meaningless." *Silva*, 482 F.2d at 1283 (applying the "arbitrary and capricious" standard to the review of an agency's Environmental Impact Statement).

To assess the substantive adequacy of the Postal Service FONSI, the Court will be guided by four factors highlighted by the D.C. Circuit:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the [Environmental Assessment]. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an [Environmental Impact Statement] can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Coalition on Sensible Transp., Inc.*, 826 F.2d at 66–67 (citing *Sierra Club v. Dep't of Transp.*, 753 F.2d 120, 127 [D.C.Cir. 1985]); *see also, Maryland–National Capital Park and Planning Comm'n v. United States Postal Ser.*, 487 F.2d 1029, 1040 (D.C.Cir.1973) (court considers the same

---

**15.** The Court accepts the existence of these materials. Waltham asserts their existence in the Supplemental Affidavit of John Cervone, and the Postal Service has not denied it.

**16.** The Court recognizes that there is a possible middle ground. In *Towns of Norfolk & Walpole*, 137 F.R.D. at 185–87, Judge Mazzone reviewed *in camera* 57 discrete documents to determine whether they "should have been includ-

ed in the administrative record or whether they should be discoverable even though not properly part of the administrative record." In view of the extensive record already assembled, however, this Court declines to launch off into an *in camera* review of "two filing cabinets full" of documents, where the parameters of such review are not otherwise identified.

four factors in reviewing a FONSI by the Postal Service).[17]

▮▮▮ Waltham's pleadings allege that the FONSI and supporting Environmental Assessments inadequately consider a range of impacts, in particular impacts on traffic, noise, wetlands, stormwater management, land use, and City tax revenues. Lexington also contends that the Postal Service inadequately considered traffic impacts. The Court will examine these areas of contention. Then it will assess whether Waltham has succeeded in showing a "substantial possibility" that the Postal Service action "could significantly affect the human environment."

### 1. Traffic Impacts.

There is no dispute that the siting of the new facility at 200 Smith Street will result in more traffic on the surrounding roads. More specifically, there will be increased traffic on Smith Street, on Spring Street (the continuation of Smith Street in Lexington extending to Route 2), at the Trapelo Road—Smith Street intersection, and at the Trapelo Road—Route 128 interchange.

The Updated Assessment presents traffic studies projecting the future traffic impact from the new facility and comparing it to the projected future traffic burden for these roads and intersections if the facility is not built. These data indicate that both intersections are presently overloaded and will become more so regardless of whether the new facility is built. More specifically, the Updated Assessment indicates that the

intersections at issue will operate (and in many cases already are operating) at "LOS F" (the lowest level-of-service traffic quality rating possible under the guidelines established by the Transportation Research Board) even if the facility is not built. Furthermore, the traffic studies show that the new facility, without any mitigation measures, would increase 1995 traffic volumes at the worst intersection, the Trapelo Road—Smith Street intersection, by 2.6 percent and 1.6 percent in the peak morning and afternoon hours respectively. Def.'s Ex. D-1 at 215.

Waltham does not dispute these findings. It makes three criticisms of the consideration by the Postal Service of these traffic issues. First, Waltham contends that even if these locations will run at LOS F without the facility being built, the new facility's presence will still have an undeniably negative impact. Campbell Aff. Second, it argues that the traffic mitigation measures discussed in the Updated Assessment will not resolve the projected traffic problems on these roads and at these intersections. Third, Waltham correctly argues that promises to mitigate certain environmental impacts in the future can not support a finding that these impacts lack significance. *See Sierra Club v. Marsh,* 769 F.2d 868, 877 (1st Cir.1985). Few, if any, of the traffic mitigation measures addressed by the Updated Assessment constitute binding obligations on the part of the Postal Service.[18]

---

**17.** No decision in this Circuit adopts this precise four-factor analysis, but the memoranda for both Waltham and the Postal Service apply it.

**18.** The Updated Assessment, Pl.'s Ex. 1-A at 128–30, pledged that the Postal Service will institute transportation management strategies such as promoting ride-sharing and funding a shuttle bus "if conditions warrant." In addition, it noted that the design plan included improvements to the two exits from the site to improve traffic flow along Smith Street. Furthermore, in the Updated Assessment, the Service offered to fund the widening of Smith Street and the Trapelo Road—Smith Street intersection, which it stated was already being planned by Waltham. Subsequent to the issuance of the Updated Assessment, however, Waltham denied having any such plans. Furthermore, Waltham ar-

gued that these improvements would require filling in wetlands and therefore would require additional wetland analyses that the Postal Service had not done. The parties do not dispute, however, that this mitigation measure would improve traffic conditions.

In its Amended Assessment, Def.'s Ex. D-1 at 208–15, the Postal Service again mentioned this traffic mitigation alternative ("alternative 3"). Noting that this alternative would create a wetlands issue, however, and acknowledging that Waltham had stated it had no plans to improve the Trapelo Road—Smith Street intersection, the Amended Assessment suggested two other mitigation alternatives. It admitted that neither of these would be as effective as its original proposal. Alternative 2, the more effective of the two, would widen the intersection and part of Smith Street without impacting on wetlands,

With respect to all three contentions, however, it should be noted that the Postal Service is not obligated to solve the already serious traffic problems at these locations, nor must the new facility have *no* traffic impact at all. The FONSI requires only that the facility have no *significant* impact on the human environment.

Lexington also challenges the adequacy of the FONSI with respect to traffic impact, contending that none of the three Environmental Assessments takes a "hard look" at the impact of truck traffic through Lexington from the facility. Lexington's Memorandum in Opposition to Postal Service's Motion for Summary Judgment, at 3. Lexington is correct that the Environmental Assessments do not study this impact. Instead, they state that truck traffic through Lexington will be insignificant for two reasons. First, the Postal Service will prohibit its trucks and private "under contract" trucks from entering the facility from the north through Lexington and from using the north driveway on Smith Street to enter the site. Second, the south exit driveway will be designed and designated to permit only right turns (going south, away from Lexington). Pl.'s Ex. 1–A at 109.

Lexington submits two affidavits by professionals knowledgeable about area traffic conditions and patterns. The affidavits allege that during periods of heavy traffic on Route 128, many vehicles use Spring Street and Smith Street to get to and from Route 2 and to bypass Route 128. The affidavits also allege that trucks will easily be able to enter the facility via Spring Street and Route 2. Corr Aff. ¶¶ 3, 4; Chalpin Aff. ¶¶ 5–10. It should be noted, however, that these affidavits in no way dispute the specific reasons given by the Environmental Assessment as to why the facility, as currently designed, will *not* increase truck traffic through Lexington.

### 2. Wetlands and Stormwater Impacts.

The quality and quantity of stormwater flowing off the site is of concern because an unnamed brook at the southern border of the site flows into the Cambridge Reservoir. The Updated Assessment recognizes this potential environmental impact and deals with it in somewhat cursory fashion, concluding that "the project will be designed so that there will not be an increase in site runoff" and that "overall, the developed ... site will generate less stormwater-related pollution than under existing conditions." Pl.'s Ex. 1–A at 13; *see also id.* at 55–73. The Amended Assessment, in contrast, presents an in-depth stormwater management plan, replete with calculations demonstrating in detail that this plan will decrease the quantity and improve the quality of stormwater flowing off the site. *See* Def.'s Ex. D–1 at 235 and Def.'s Ex. D–2.

Waltham makes two criticisms of the stormwater analysis. First, it disputes the accuracy of the stormwater plan's groundwater calculations. Daylor Aff. ¶¶ 12 and 13. With some trepidation, the Court rejects this point as a basis for considering the Updated Assessment inadequate, mindful that its role is not to rule on the merits of conflicting scientific data and conclusions. Second, Waltham claims the stormwater analysis in the Amended Assessment is inadequate because it fails to consider the detrimental impact that a reduced stormwater flow will have on the wetlands at the site. Daylor Aff. ¶¶ 11 and 15. On this point, Waltham is entirely correct.

The Updated Assessment does not consider the impact of decreased stormwater runoff available for on-site wetlands, since its focus is on the concern downstream with increased runoff. The Amended As-

---

but would also require the City's participation. Alternative 1, admittedly the least effective of the three, would solely involve changes at the point where the site's present southern access road enters Smith Street. The Service admitted that this would improve traffic on Smith Street, but not at the Trapelo Road—Smith Street intersection.

At most, then, the Environmental Assessments commit the Service to improvements included in its design plan which would ameliorate only the flow of traffic at the two exits from the site onto Smith Street.

sessment, in contrast, reveals that the stormwater management plan will be so effective as to reduce the stormwater runoff available for on-site wetlands.

 Where the agency has taken a hard look at the environmental issue, the Court will not invalidate an agency's considered scientific determination. *See, e.g., Sierra Club v. Dep't of Transp.*, 753 F.2d 120, 129 (D.C.Cir.1985). Here the very detail of the Amended Assessment convincingly limns the relative inadequacies of the wetlands and stormwater impact reports found in the Initial and Updated Assessments. Specifically, the Amended Assessment reveals that, far from "a hard look" at downstream pollution from stormwater runoff, the Postal Service gave the matter a marginally adequate glance. Moreover, comparison of the Updated and Amended Assessments reveals that the conclusions of the first as to the quantity of stormwater runoff are wholly out of date, and the attempt in the second to manage such runoff wholly ignores the impact of such a decrease in available water for the on-site wetlands.

3. Noise Impacts.

The record indicates that the Postal Service did a detailed study of the noise pollution impact likely to result from the new facility, largely from increased truck and car traffic on Smith Street. Def.'s Ex. D–1 at 216–25. The study identified seven residential houses that might be affected by facility-generated noise and examined the likely noise impacts on them under three alternative design plans for Smith Street and the Smith Street—Trapelo Road intersection. It determined that six of these houses were likely to experience noise increases resulting in some sleep disruption under at least one of the three alternative roadway plans.

The Updated Assessment proposed five mitigation measures which would prevent any sleep disruption. These are (1) paying for air conditioners for the affected homes, (2) altering the south driveway so that less gear shifting occurs near the entrance to Smith Street, (3) installing docking collars

on each loading dock on the south side of the facility, (4) strictly enforcing Massachusetts DEP Regulation Section 7.11 which prohibits unnecessary operation of a motor vehicle's engine while the vehicle is stopped for more than five minutes, and (5) installing a fence along the east side of the south access road to serve as a visual and noise barrier between that access road and Smith Street. *Id.* at 225.

While Waltham does not dispute the Postal Service conclusion from its noise pollution analysis that the new facility will cause noise increases resulting in sleep disruption for no more than six residential houses, it is correct in arguing that nonbinding promises to mitigate significant impacts can not justify a FONSI. *See Sierra Club v. Marsh*, 769 F.2d at 877. All five mitigation measures are listed as "proposed" mitigation measures in both the Updated Assessment, Pl.'s Ex. 1–A at 162–63, and the Amended Assessment, Def.'s Ex. D–1 at 225. In addition, the Postal Service stated explicitly in a December 5, 1990 letter from Robert Coven to W. Douglas Gardiner that it was committing itself to installing the fence along the south access road. *See* Def.'s Ex. D–1 at 265–66. Arguably none of these representations create a binding commitment on the part of the Postal Service to undertake these measures. The Court need not determine, however, whether the Postal Service representations regarding proposed mitigation measures constitute binding commitments because, as explained *infra* at Part IV.D.5., the Court rules that these noise impacts are not legally significant.

4. Land Use and Tax Impacts.

 Waltham contends that the Postal Service has not considered adequately either the project's impact on Waltham tax revenues or its lack of conformity with the zoning of the Smith Street site and abutting lands. In reviewing these claims, the Court notes at the outset that the Postal Service, a tax exempt entity, is not obligated to do any more than consider this impact. Nor is it obligated to comply with local zoning ordinances. Furthermore, it is

generally recognized that harmful tax consequences and conflicts with local zoning laws, other than those imposed to protect the environment, are not sufficient bases for requiring a federal agency to prepare an Environmental Impact Statement. Where a proposed action has other impacts on the *physical* environment, however, these "cultural" impacts may be considered in determining whether an Environmental Impact Statement is required. *Village of Palatine v. United States Postal Serv.*, 742 F.Supp. 1377, 1388–89 (N.D.Ill.1990); *see also, Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983) (holding that as a threshold matter, NEPA is concerned with actions that cause a primary impact on the physical environment).

With respect to tax impact, Waltham and the Postal Service, in its Updated Assessment, agree that the purchase of the Smith Street site by the Postal Service will deprive Waltham of $560,000 in annual property tax revenues. The Postal Service has not offered to make any payments in lieu of taxes, but it has offered to provide Waltham with $1,600,000 for roadway improvements at the Trapelo Road—Smith Street intersection. Pl.'s Ex. 1–A at 76.

With respect to land use impact, Postal Service environmental assessments mischaracterize the zoning classifications of the Smith Street site, thereby obscuring the degree to which the facility will conflict with local zoning law. The Updated Assessment describes the site as located in a "limited commercial" zone and states that the facility would be classified as a "municipal building" under the Waltham zoning ordinance. It also states that the facility's use of the site for mail processing and distribution resembles the most recent occupant's (Bull, Inc.) use of the site for office space and distribution. Pl.'s Ex. 1–A at 77–78. In fact, the zoning applicable to the Smith Street site is residential. Furthermore, under the Waltham zoning ordinance, the proposed facility would be classified as a "trucking terminal" which is an impermissible use for the site. Cervone Supplemental Aff. ¶¶ 15 and 16.

5. Conclusion of the Court's Substantive Review: the FONSI is not Arbitrary and Capricious.

The Court has reviewed the record and Waltham's extra-record evidence regarding the disputed areas of impact in light of the four factors highlighted in *Coalition on Sensible Transp., Inc.*, 826 F.2d at 66–67. First, the Postal Service, through its Updated Assessment, has at least *identified* all of the environmental concerns raised by Waltham and Lexington, including wetlands, traffic, noise, and stormwater impacts.

Second, the record establishes that the Postal Service took a *hard look* at most of the identified environmental concerns and recognized the impact of truck traffic on Lexington, noted but misconceived the compatibility of the project to existing zoning laws, had only glanced at the effect of downstream pollution at the time of decision (but now seems to be grappling in an intellectually honest fashion with that issue), and continues to ignore the effect on the wetlands of some decrease in stormwater runoff.

Third, the Postal Service has made out a *convincing case* before this Court [19] in support of its Finding of No Significant Impact.[20] The Court briefly summarizes the

---

**19.** In addressing this aspect of the four-part analysis, the Court reads the requirement that "the agency must be able to make a convincing case for its finding," *Coalition on Sensible Transp., Inc.*, 826 F.2d at 66, as speaking to the case made out before a reviewing court and *not* to the record developed prior to the FONSI. This seems the natural consequence of the shift from the past to the present tense employed by the D.C. Circuit when laying out the test. The distinction is significant and may be crucial because, in evaluating whether the Postal Ser-

vice has made out a convincing case, this Court has looked not only to the Administrative Record but to the Amended Assessment as well. The Court expresses no opinion concerning the outcome as to this part of the test were it not to look to the Amended Assessment to see in what fashion and how well it confirms the FONSI.

**20.** Given that the Service reasonably found there were no significant impacts, the Court need not examine the fourth factor. "[I]f the agency does find an impact of true significance,

Postal Service case as to each environmental impact.

(i) With respect to traffic impact, it is undisputed that the relevant roads and intersections will continue to be overloaded even without the construction of the new facility. This is not to say that the new facility will not increase the traffic burden on surrounding roadways. The Postal Service traffic study concludes that in 1995 the worst of the neighboring intersections, the Trapelo Road—Smith Street intersection, will experience 2.6 and 1.6 percent increases in traffic volumes at the morning and evening rush hours respectively, as a result of the new facility. While the Postal Service traffic study does not consider the potential for increased truck traffic through Lexington, the Postal Service contends, and Lexington does not refute, that such truck traffic will not be significant because of the planned design changes and traffic regulations regarding the two access roads from the site.

(ii) With respect to stormwater impact, the Postal Service claims and purports to prove that its stormwater management plan will reduce the quantity and improve the quality of runoff as compared to the runoff currently emanating from the site. The record also indicates that there will be no construction in or filling of wetlands or floodplains on the site. The Court recognizes, however, that the Postal Service neglects to consider the effect of decreased runoff on the wetlands located on the site but concludes that Waltham has failed to show that such neglect creates a substantial possibility that the new facility could *significantly* affect the quality of the human environment. *Sierra Club v. Marsh,* 769 F.2d at 870.

(iii) With respect to noise impact, the record indicates that, without mitigation measures, the facility will cause sufficient traffic increases to generate some sleep-disrupting noise pollution effects on no more than six residential homes located near the site. The Postal Service has pro-

posed mitigation measures which, if implemented, would "reduce the impact to a minimum." *Coalition on Sensible Transp., Inc.,* 826 F.2d at 67. Nevertheless, the Court notes that most, if not all, of the Postal Service promises to implement noise mitigation measures may not constitute legally binding commitments.

(iv) With respect to tax impact, it is undisputed that the use of the site for the Postal Service facility will deprive Waltham of $560,000 annually in tax revenue. With respect to land use, the Court recognizes that, taking Waltham's factual allegations to be true, the facility will conflict with the local zoning ordinance. The Court notes, however, that zoning and tax impacts, on their own, can not constitute significant environmental impact requiring the preparation of an Environmental Impact Statement. *Metropolitan Edison,* 460 U.S. at 772–73, 103 S.Ct. at 1560–61.

Having examined and summarized the adverse impacts alleged by Waltham and Lexington with respect to traffic, wetlands, stormwater, noise, land use, tax revenue, and zoning, the Court rules that the Service has here made a convincing case for its findings that none of these impacts, *taken individually,* constitutes a significant environmental impact. More importantly, based on the Court's examination of these impacts taken *as a whole,* the Court concludes that the Postal Service has made a convincing case for finding that the new facility will cause no significant environmental impact. Thus the Court concludes that Waltham and Lexington have not shown the Court that there is a substantial possibility that the facility will affect the quality of the human environment. Therefore, the Court holds that the Postal Service FONSI is substantively adequate and is not arbitrary and capricious. *See, e.g., Sierra Club v. Marsh,* 769 F.2d at 876–77 (refusing to conclude that an agency's FONSI was arbitrary and capricious where the proposed action had varying degrees of adverse effect on clam flats, lobster, scal-

preparation of an [Environmental Impact Statement] can be avoided only if the agency finds that changes or safeguards in the project suffi-

ciently reduce the impact to a minimum." *Coalition on Sensible Transp., Inc.,* 826 F.2d at 67.

lops, waterfowl, seals, 40 acres of woodland, toxicity of water in harbor, and tidal flow); *Conservation Law Found. v. United States Air Force,* No. 87–1871, 1987 WL 46370, 1987 U.S.Dist. Lexis 15149 (D.Mass. Nov. 23, 1987) (holding that a FONSI for the construction of Air Force defense towers was not arbitrary and capricious where the only impacts were adverse aesthetic effects and danger to bald eagles).

■ One may well question how this Court can conclude that the four-part *Coalition* test has been met here, where something less than a "hard look" has been given to certain environmental considerations and no look at all has been given to the matter of decreased stormwater runoff. True, the issue is a close one, but the setting in which this ruling must be made is significant. Moreover, as the D.C. Circuit makes clear, the four-part *Coalition* test is not to be applied in an overly mechanistic fashion; some latitude must be given to the Postal Service.

The NEPA process involves an almost endless series of judgment calls. Here we consider ones relating to the detail in which specific items should be discussed and the agencies' treatment of the project's relation to other government activities. It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts. The latter's "role ... is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).

*Coalition,* 826 F.2d at 66 (omission in original).

The Court here holds that the Postal Service gave adequate consideration to the requisite environmental concerns, nothing more.

## E. The Procedural Adequacy of the EAs and the FONSI.

Waltham's Counts I and II also claim that as matter of law the Postal Service Environmental Assessment/FONSI process was so procedurally tainted and improperly influenced that it should be struck down under the Postal Reorganization Act and NEPA. Generally, Waltham alleges that, in violation of the Postal Service's own Environmental Procedures ("Part 775 environmental regulations"), 39 C.F.R. § 775, and Protection of Wetlands Procedures ("Part 776, wetlands regulations"), 39 C.F.R. § 776, the Postal Service, at least in part motivated by political concerns, first decided on the Smith Street site and then conducted an incomplete and flawed environmental review process to justify this selection. More specifically, the procedural inadequacies and improper influences which Waltham alleges in Paragraphs 6–37 of the Complaint are that the Postal Service:

(1) pre-selected the Smith Street site without ever completing a mandatory wetlands study and a mandatory "no practicable alternatives" wetlands analysis;

(2) pre-selected the Smith Street site before completing its environmental review;

(3) failed to consider adequately in its three Environmental Assessments the proposed facility's environmental impacts at the Smith Street site relative to other alternative sites;

(4) made repeated misrepresentations regarding the site selection process to local officials, denied them access to relevant public records, and failed to solicit and consider adequately public input regarding the site selection and environmental review process; and

(5) used the illegal criterion of "political feasibility" as a primary factor in its site selection decision.

The Court will examine the adequacy of the Postal Service procedures first in light of its Part 776 wetlands regulations and then in light of its Part 775 environmental regulations.

**128**

1. The Alleged Violations of Postal Service Wetlands Regulations.

In the Part 776 wetlands regulations, the Postal Service has promulgated regulations governing its environmental review process relative to wetlands and floodplains. These regulations also provide that more detailed implementation procedures are set forth in Postal Service Handbook RE–6 (the "Handbook"). 39 C.F.R. § 776.1(d). Waltham claims that the Postal Service violated these regulations and Handbook procedures by not conducting a mandatory wetlands study and not performing a "no practicable alternatives" wetlands analysis as part of its site selection and environmental review process. The Postal Service contends that it fully complied with its regulations, but it also argues that these regulations and Handbook provisions create no private right of action. The Court first will address this threshold issue of enforceability.

a. *The Enforceability of the Wetlands Regulations.*

The Postal Service Part 776 wetlands regulations were promulgated to implement Executive Orders 11988, "Floodplain Management", and 11990, "Protection of Wetlands," both of which were issued in 1977 under the authority of the National Environmental Policy Act. Exec.Order No. 11988, 42 Fed.Reg. 26951 (1977), as amended by Exec.Order No. 12148, 44 Fed.Reg. 43239, § 2 (1979); Exec.Order No. 11990, Fed.Reg. 26961, as amended by Exec.Order No. 12608, 52 Fed.Reg. 34617, § 1(a) (1987). The purpose of these orders was "to avoid adverse impacts associated with the occupancy and/or modification of floodplains; or the modification and destruction of wetlands." 39 C.F.R. § 776.1.

These Executive Orders direct that, when "acquiring, managing, and disposing of Federal lands and facilities; and.... conducting Federal activities and programs affecting land use[,]" federal agencies "shall take action" to preserve and minimize the destruction of wetlands and floodplains. Essentially the orders direct that agencies consider wetland and floodplain impacts when undertaking the above-mentioned actions. Exec.Order No. 11988, § 2; Exec.Order No. 11990, § 1(a). More specifically, when an agency proposes construction on a floodplain or in a wetland, it must determine whether there is any "practicable alternative" to such construction. In other words, it must conduct a "no practicable alternatives" analysis before it may proceed with the construction. Exec.Order No. 11988, § 2(a); Exec.Order No. 11990 § 2. In addition, both orders specifically require that agencies provide an opportunity for early public review of any plans which will impact on floodplains or wetlands. Exec.Order No. 11988, § 2(a)(4); Exec.Order No. 11990, § 2(b). Finally, the orders direct agencies to issue or amend their existing procedures to comply with the orders. Exec.Order No. 11988, § 2(d); Exec.Order No. 11990, § 6.

The "Purpose and policy" section of the Postal Service wetlands regulations, 39 C.F.R. § 776.1, states in pertinent part:

(b) These procedures implement Executive Orders 11988 and 11990 and are adopted under the Postal Reorganization Act rather than the statutes listed in paragraph (a) [referring to NEPA] ... to the extent these statutes do not apply to the Postal Service under 39 U.S.C. § 410(a).

(c) These procedures provide guidance:

(1) To avoid direct or indirect, long or short term adverse impact on floodplains and wetlands;

(2) To reduce the risk of flood loss;

(3) To minimize the impact of floods on human safety, health, and welfare; ...

(5) To minimize the destruction, loss, or degradation of wetlands; ...

(d) These procedures are general in nature. Postal Service Handbook RE–6, *Environmental Procedures,* provides detailed procedures for implementing these executive orders.

■ The Postal Service contends that these wetlands regulations do not create a private right of action because they were promulgated pursuant to Executive Orders, not to a specific directive under NEPA. Furthermore, the Postal Service contends that the language of the wetlands regula-

tions shows they create no private right of action. The Postal Service points to subsection (c) of section 776.1 which states that the regulations "provide guidance," and to subsection (d) which states that "these procedures are general in nature" and that the Handbook provides "detailed procedures for implementing these executive orders."

The Postal Service also draws support from *United States v. 27.09 Acres of Land,* 737 F.Supp. 277 (S.D.N.Y.1990) ("*27.09 Acres I* "). In *27.09 Acres I,* the district court, for reasons similar to those cited above, held that the Postal Service Relocation Assistance and Real Property Acquisition Policies and the corresponding procedures set forth in the Handbook did not create a private right of action.

Waltham cites three cases to support its view that the regulations create a private right of action. The first, *Village of Palatine,* 742 F.Supp. 1377, simply states that the regulations are privately enforceable, relying completely on *Peoples Gas, Light & Coke Co. v. United States Postal Serv.,* 658 F.2d 1182, 1191 (7th Cir.1981). There the Seventh Circuit treated the regulations as privately enforceable, but never explicitly addressed the private enforceability question. The third case Waltham cites is *United States v. 27.09 Acres of Land,* 760 F.Supp. 345 (S.D.N.Y.1991) ("*27.09 Acres II* "), the follow-up case to *27.09 Acres I.* In *27.09 Acres I* the Postal Service had not disputed that it was bound by its wetlands regulations and, accordingly, had agreed to do a "no practicable alternatives" analysis as required by the regulations when construction in wetlands is proposed. In *27.09*

*Acres II,* the court never expressly stated that the wetlands regulations are privately enforceable. Nevertheless, it did state that "if the Postal Service determines that there is no alternative to construction that would affect a wetland ..., it may proceed with the project, but only after providing detailed public notice and a thirty day public comment period prior to acquiring the land. 39 C.F.R. §§ 776.5, 776.8." *Id.* at 349. Implicit in this statement is a view that the plaintiff *can enforce* the wetlands regulations against the Service. But once again, this case offers no supporting rationale for finding a private right of action in the wetland regulations.

As Judge Nelson of this district remarked in an analogous context, each of these arguments

> misses the mark. Plaintiffs in this case do not seek a private right of action under the executive orders. Rather, their right of action, undisputed by the defendants, arises under the APA. The executive orders instead provide some of the substantive legal standards against which the Secretary's actions are reviewed under the APA.

*Conservation Law Found. v. Clark,* 590 F.Supp. 1467, 1477 (D.Mass.1984) (addressing argument that Executive Order 11644, also issued in furtherance of NEPA, created no private right of action).

So here, the Plaintiffs are not suing for damages. They seek to enforce the Postal Service wetlands regulations through an action for declaratory and injunctive relief. Their right of action arises under the Administrative Procedure Act.[21] As a

---

**21.** This Court stresses that the Plaintiff's challenge here arises under the APA even though this challenge is crafted as a direct challenge under the wetlands regulations and not as an arbitrary and capricious challenge. In support of this conclusion, the Court notes the analysis of Judge Pettine in *Project B.A.S.I.C. v. Kemp,* 776 F.Supp. 637 (D.R.I.1991) in reviewing a challenge against actions by the United States Department of Housing and Urban Development. In *Project B.A.S.I.C.,* Judge Pettine stated that:

> [t]he APA standard of review is set forth in section 706(2)(A), (C): "[t]he reviewing court shall hold unlawful and set aside agency ac-

tion, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" *or* "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...."

*Id.* at 641.

Based on this statutory language, Judge Pettine concluded that a challenge of an agency action, whether brought as an "arbitrary and capricious challenge" or as a "direct statutory challenge" arises under the APA. *Id.* In support of this proposition, he cited the following statement by the First Circuit in *Cousins v. Sec'y of U.S. Dep't of Transp.,* 880 F.2d 603 (1st Cir. 1989) (en banc):

"threshold matter," however, an "agency action is not reviewable [under the APA] if it is 'committed to agency discretion by law.' 5 U.S.C. § 701(a)(1)." *Project B.A.S.I.C. v. Kemp*, 776 F.Supp. 637, 642 (D.R.I.1991). "[T]he Supreme Court [has] explained that this exemption is not applicable when there is 'law to apply.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 413, 91 S.Ct. at 822. Thus, the question before the Court is whether the Executive Orders and the Postal Service implementing regulations provide legal standards for the Court's review of the actions of the Postal Service under the Administrative Procedure Act. *See Project B.A.S.I.C.*, 776 F.Supp. at 642; *see also Conservation Law Found.*, 590 F.Supp. at 1477 (Nelson, J.); *Conservation Law Found. v. Pierce*, No. 81–2367, slip op. at 3 (D.Mass. July 22, 1982) (Skinner, J.).[22]

The First Circuit has elaborated the following test concerning whether the federal courts have jurisdiction over a claim alleging a federal agency's violation of its own regulations:

> [I]n deciding whether a particular agency policy pronouncement may properly serve as the basis of jurisdiction under either [28 U.S.C.] § 1331(a) or [28 U.S.C.] 1346(a)(2), we examine: (I) the statutory authorization for promulgation, and (II) the formality of the promulgation. We weigh these factors to decide whether the policy pronouncement may be used as a basis of a suit in the federal courts.

*Chasse v. Chasen*, 595 F.2d 59, 62 (1st Cir.1979).

Based on the First Circuit's test in *Chasse*, the Court must analyze three grounds upon which the wetlands regulations and the Handbook may not be judicially enforceable. First, it may be that the Executive Orders are not binding on the Postal Service because they themselves lack the force of law. Second, even if the Executive Orders have the force of law and apply to the Postal Service, the Postal Service Regulations may not meet the "formality of promulgation" requirement. If either of these points are answered in favor of the Postal Service, this Court may not proceed further on this aspect of the case because it lacks subject matter jurisdiction under 28 U.S.C. § 1346(a)(2). *Chasse*, 595 F.2d at 62–64. Third, even if the Orders are judicially enforceable, they may not be applicable to the Postal Service because of its exemption under the immunity provision of the Postal Reorganization Act, 39 U.S.C. § 410(a) (1988).

As to the first point, in this Circuit, Executive Orders have "the status of law if they have 'some basis in an act of Congress,' 'pursuant to either a statutory mandate or delegation of authority from Congress.'" *Conservation Law Found. v. Clark*, 590 F.Supp. at 1477 (quoting *Romero–Barcelo v. Brown*, 643 F.2d 835, 844 [1st Cir.1981] and *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234 [8th Cir.1975], *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 [1976]). There is no explicit language in NEPA authorizing executive orders in furtherance of the act, but such authorization can be implied. *Conservation Law Found. v. Clark*, 590 F.Supp. at 1477 (citing *United States v. New Orleans Pub. Serv., Inc.*, 553 F.2d 459, 465 [5th Cir.1977]). NEPA makes just such an implied authorization. *See Conservation Law Found. v. Clark*, 590 F.Supp. at 1477 (holding that Executive Orders 11644 and 11989, issued in furtherance of NEPA, have "the force and effect of law" and are enforceable); *see also, Conservation Law Found. v. Pierce*, No. 81–2367, slip op. at 3 (holding that private

---

"Courts and litigants may typically refer to the first, 'arbitrary, capricious' type of legal challenge, in a shorthand matter, as an 'APA challenge,'" and they may refer to the question whether the regulations violate a substantive statute as a challenge under the statute itself. But technically this latter challenge falls within the purview of the APA just as the former does.

*Project B.A.S.I.C.*, 776 F.Supp. at 642–43 (quoting *Cousins*, 880 F.2d at 608).

**22.** The Court notes that, unlike the Executive Orders and the Postal Service implementing regulations, the Handbook does not provide legal standards for the Court's review. For reasons explained more fully *infra* at 131–32, the Court rules that the Handbook provisions are not privately enforceable.

claim that agency violated Executive Order 11988 is enforceable and judicially reviewable under the APA).[23] This Court likewise rules that these Executive Orders possess the full force of law and are as fully judicially enforceable as NEPA itself.

The Postal Service, however, highlights certain language in the wetlands regulations which might suggest that the regulations are only voluntary expressions of internal agency policy and therefore do not meet the second *Chasse* requirement, the "formality of promulgation" requirement. This argument fails as to the wetlands regulations which were published in the Code of Federal Regulations. *See, e.g., Chasse*, 595 F.2d at 61–64 (stating, in dicta, that an agency pronouncement promulgated in accordance with the procedural and publication requirements of the APA meets the formality requirement). Furthermore, contrary to the assertions of the Postal Service, the wetlands regulations speak explicitly in mandatory terms manifesting a level of specificity comparable to its Part 775 environmental regulations.[24] The Postal Service wetlands regulations, promulgated to implement the Executive Orders, are binding on it and enforceable by this Court, in accordance with the APA and pursuant to the subject matter jurisdiction conferred by 28 U.S.C. § 1346(a)(2).

The Court reaches an opposite conclusion, however, when applying the same "formality" requirement to determine the enforceability of the Handbook. Although the Handbook is mentioned in 39 C.F.R.

§ 776.1(d), it has never been published or incorporated by specific reference in the Code of Federal Regulations. The Court notes that in *27.09 Acres I*, the district court found the provisions of the Handbook unenforceable. 737 F.Supp. at 286–87. It stressed that the Handbook had not been specifically incorporated in Postal Service regulations. *Id.* at 286. It then reviewed other cases holding that internal agency documents similar to handbooks, such as a parole commission manual and an IRS manual, are not enforceable against an agency. *Id.* at 287. It observed that such internal documents have only been found enforceable where they were "legislative in nature, affecting individual rights and obligations." *Id.* at 287 (quoting *United States v. Fifty–Three Eclectus Parrots*, 685 F.2d 1131, 1136 [9th Cir.1982]) Thus, Judge Lasker concluded:

> [T]he Handbook does not purport to create individual rights or obligations, and thus must be distinguished from agency documents that do directly affect citizens. . . . [T]he pertinent provisions of Handbook RE–6 prescribe rules of agency procedure and practice which do not "affect individual rights and obligations" and which are not legislative in nature. Handbook RE–6 is merely a detailed set of procedures. . . . [T]he provisions of Handbook RE–6 are not enforceable.

*Id.* at 287. The Court adopts this reasoning and holds here that the Handbook is likewise not enforceable.[25]

---

**23.** Courts elsewhere appear to be split on the enforceability of executive orders issued in furtherance of NEPA. *Watershed Assocs. Rescue v. Alexander*, 586 F.Supp. 978, 987 (D.Neb.1982), held that E.O. 11988 is *not* judicially enforceable. A number of cases appear to accept implicitly that such executive orders are enforceable. *Wyoming Wildlife Fed'n v. United States*, 792 F.2d 981, 984 (10th Cir.1986), never explicitly holds that E.O. 11990 is privately enforceable, but implicitly accepts that it is privately enforceable by ruling on the merits of a private claim alleging agency's violation of this order. *National Wildlife Fed'n v. Adams*, 629 F.2d 587 (9th Cir.1980), held that E.O. 11990 was enforceable under APA § 706(A)(2).

**24.** The Court does not accept the Postal Service's characterization of the language in its wetlands regulations. It is true that the regula-

tions state that the procedures "provide guidance" and are "general in nature." However, the procedures in fact are set forth in explicit mandatory language and with specificity comparable to the environmental regulations. Furthermore, in other regulations, the Postal Service, seeking to make clear its own intent not to be bound by any federal statute or by its own regulations, includes repeated language stating explicitly that the particular regulations are "voluntary" or that the regulations create no enforceable right or benefit. *See* 39 C.F.R. §§ 777.11 and 777.12 (the Site Acquisition Regulations) and 39 C.F.R. § 778.1(c) (the Intergovernmental Cooperation Regulations).

**25.** The analysis that follows regarding the compliance of the Postal Service with its own environmental review procedures will, therefore,

The third concern, the Postal Reorganization Act's immunity provision, provided part of the basis for the court's ruling in *27.09 Acres I* that a provision of the Relocation Assistance and Real Property, 39 C.F.R. § 777.31(a), was not judicially enforceable. The Postal Service regulation at issue in that case, 39 C.F.R. § 777.31(a), was promulgated in "voluntary compliance" with the Uniform Relocation and Real Property Acquisition Act of 1970. *27.09 Acres I*, 737 F.Supp. at 285. The Court held that the Uniform Relocation Assistance and Real Property Acquisition Act was precisely the sort of federal statute from which the Service was exempt under section 410(a) of the Postal Reorganization Act. The district court concluded that the regulation in issue was not enforceable because:

> [T]he regulation is not promulgated pursuant to a statute which applies to the Postal Service, but rather one with which the Postal Service voluntarily complies, and the text of the regulation explicitly states a policy objective, not a binding obligation[.]

*Id.*

This Court, based on an analysis of Executive Orders 11988 and 11990 in light of the purpose of the Postal Reorganization Act immunity provision, concludes that the Postal Service is subject to these Executive Orders. This Court has already stated that Executive Orders 11988 and 11990 exert the full force and effect of law, applying with the same force and effect as NEPA, the statute under which they were issued. Therefore, if the Postal Service is not exempt by law from NEPA's applicability, it also is not exempt from the Executive Orders' applicability.

No case in this Circuit has addressed expressly the question whether the Service is exempt from NEPA under the Postal Reorganization Act's immunity provision, 39 U.S.C. § 410(a). The Second Circuit has explicitly rejected the argument that the Postal Service's immunity under the Postal

Reorganization Act exempts it from NEPA. *See Chelsea Neighborhood Ass'ns v. United States Postal Serv.*, 516 F.2d 378, 384 (2d Cir.1975). In *Chelsea Neighborhood,* the Second Circuit reasoned that the Postal Reorganization Act immunity provision was designed to exempt the Postal Service from outmoded, "managerial" statutes which would interfere with efficient, modern business and management practices, not from federal statutes furthering broad national policies such as NEPA. *Id.* at 384. *See also, City of Rochester v. United States Postal Serv.*, 541 F.2d 967 (2d Cir. 1976) (applying the reasoning of *Chelsea Neighborhood* in holding that the Postal Service is bound by the Intergovernmental Cooperation Act); *Kuzma v. United States Postal Serv.*, 798 F.2d 29, 31 (2d Cir.1986) (applying the reasoning of *Chelsea Neighborhood* and *City of Rochester* in holding that the Postal Service is not bound by the Paperwork Reduction Act).

The Court considers this reasoning persuasive. Since the Postal Service is not exempt from NEPA, it is also bound by Executive Orders issued in furtherance of NEPA. The Executive Orders require agencies to conform their procedures to the Executive Orders. Exec.Order No. 11988, § 2(a)(4); Exec.Order No. 11990, § 2(b). Therefore, the Postal Service cannot exempt itself from the Executive Orders by inserting language in its wetlands regulations suggesting that the regulations express only voluntary policy objectives. There is "statutory authorization" to justify this Court asserting jurisdiction over a claim alleging a violation of Postal Service wetlands regulations.

b. *Did the Postal Service Comply with its Wetland Regulations?*

Waltham claims the Postal Service has violated the wetlands review procedures set forth in 39 C.F.R. §§ 776.5 and 776.8 (1990). These provisions establish one set of review and notification procedures for all proposed construction projects and an additional set of more rigorous review and

___

only concern the procedures set forth in 39 C.F.R. §§ 775, 776, and not those set forth in its

Handbook.

notification procedures for proposed projects involving construction in a floodplain or wetlands.

The regulations require that information concerning impacts on floodplains and wetlands be collected throughout the planning process for any proposed project. 39 C.F.R. § 776.5(a). Whenever the proposed action *will occur in* or *impact* a floodplain or wetland, the Postal Service must develop information on the following:

(1) whether the proposed action will directly or indirectly support construction in a floodplain;

(2) what impacts the proposed action will have on floodplains or wetlands, including positive and negative, concentrated and dispersed, short-term and long-term;

(3) what degree of flood hazard and risk to lives and property is created by the proposed action;

(4) what are the natural and beneficial values of the floodplain; and

(5) what measures can be taken to preserve the floodplain, minimize harm to it, or restore it.

39 C.F.R. § 776.5(b). All wetland and floodplain information developed by the Postal Service must be evaluated in the Environmental Assessment or the Environmental Impact Statement, if either is prepared, and must be made available to the public. 39 C.F.R. § 776.5(d).

If the use of a particular site for a proposed action will require *construction in* a floodplain or wetland, the regulations require that the Postal Service conduct a "no practicable alternatives" analysis. 39 C.F.R. § 776.5(a). This analysis must evaluate: (1) alternate sites as identified in the site planning process; (2) other means for accomplishing the same purpose as the proposed action; and (3) a no-action alternative. 39 C.F.R. § 776.5(e). If this analysis concludes that there is no practicable alternative to construction in a floodplain or

wetland, a final reevaluation must be conducted by the Facilities Service Center Director. 39 C.F.R. § 776.5(f). If this final reevaluation confirms that there is no practicable alternative, the Facilities Service Center must provide public notice of the proposed action "as soon as possible." 39 C.F.R. § 776.5(i). This public notice must allow for a thirty-day public comment period before any action is taken to acquire the site. 39 C.F.R. § 776.8(c).

▆ Waltham alleges that the Postal Service failed to comply with the requirements (i) that it conduct a "wetlands study", (ii) that it conduct a "no practicable alternatives" analysis, and (iii) that it provide public notice of the proposed action's wetland impacts before acquiring the Smith Street site. The Court's review of the record does not support any of these allegations.

(i) The Postal Service December 29, 1989 Alternative Site Environmental Assessment of the three competing sites, included in the Updated Assessment, shows that the Postal Service did collect and consider information concerning floodplain and wetland impacts during its evaluation of contending sites. *See* Pl.'s Ex. 1–D at 688–704. The consideration given there to wetland and floodplain impacts satisfies 39 C.F.R. § 776.5(a) which requires only that "information concerning impacts on wetlands and floodplains" be "collected and considered." [26]

Moreover, the Updated Assessment presents an analysis of wetland and floodplain issues relative to the Smith Street site which covers the information required under 39 C.F.R. § 776.5(b). *See* Def.'s Ex. D–1 at 226–38 and 348–58; Def.'s Ex. D–2 at 432–37. Therefore, the Court concludes that the Postal Service has complied with its regulations mandating the gathering and considering of wetland and floodplain information.[27]

---

**26.** 39 C.F.R. § 776.5(a) does not specify either amounts or specific types of wetland/floodplain information that must be collected and considered.

**27.** Arguably the Postal Service need not comply with the more specific information gathering requirements of 39 C.F.R. § 776.5(b) at all. These requirements apply only where "a proposed action will occur in or impact a floodplain or wetland site." If the wetland and

(ii) The Postal Service is obligated to do a "no practicable alternatives" analysis only if the proposed action involves construction in a wetland or floodplain. 39 C.F.R. § 776.5(a). The Updated Assessment states clearly that there will be no construction in a floodplain or wetland. Pl.'s Ex. 1–A at 71, 73. Waltham disputes this conclusion based on the analysis of its wetlands consultant. Standley Aff., ¶ 6. In response to the concerns raised by Dr. Standley, the Postal Service, in its Amended Assessment, slightly increased the delineated area of wetlands, altered the stormwater management plan so that no wetland site would be used as a stormwater detention basin, and adopted a slightly different traffic plan to obviate the need for filling any wetlands. Def.'s Ex. D–1 at 226–34.

Here again, fairly read, the Amended Assessment—if it does nothing more—reveals the inadequacies of the Initial and Updated Assessments. In context, with respect to potential construction in a wetland or floodplain, the Amended Assessment says in effect, "Well, yes, we said in the Updated Assessment that we wouldn't do any such construction in a floodplain or a wetland. But we were wrong, and the Standley affidavit convinces us, in part, of the error of our ways. Consequently, in this Amended Assessment we'll fix things (at least to our satisfaction) so we won't do any such construction—and also we won't have to do a 'no practicable alternatives' analysis."

Where does such a chronology leave the reviewing Court? The administrative record, as this Court has defined it, is clearly inaccurate in this respect. At the moment of the crucial administrative decision the Postal Service, pursuant to regulations it was bound to enforce, was required to— and had not—done a "no practicable alternatives" analysis.[28] Later, apparently realizing its mistake, the Postal Service reconsidered the extent of the floodplain and

wetlands and satisfied itself through minor revisions in its plan that it could avoid the proscribed construction.

The Postal Service, characterizing this chronology as the appropriate working-out of the administrative process, views the Amended Assessment as a sensitive and more than adequate response to local governmental concerns—one which certainly ought not trigger the penalty of a standstill injunction while the matter is remanded for retreading the ground already covered in the Amended Assessment.

Waltham sees the matter differently. It argues persuasively that, once it is established that the predecision procedures were significantly flawed, this Court ought give no weight to the suspect, post-hoc rationalizations found in the Amended Assessment especially in light of the Standley affidavit which, were this Court to accept its conclusions, demonstrates that even the plan as revised through the Amended Assessment will involve filling wetlands (as Standley defines them) and thus requires a pre-decision "no practicable alternatives" study.

At minimum, Waltham claims it surely has uncovered a "genuine issue of material fact" as to which a trial must be held. No evidentiary hearing is here appropriate, however, since it is the agency, not this Court, which is charged with the fact-finding mission. Upon the materials before the Court, therefore, while the issue is an extremely close one, I accept the conclusion of the Postal Service that its proposed action as set forth in the Amended Assessment will not now involve construction in a floodplain or wetland. Therefore, the Court holds that the Postal Service was not required to do a "no practicable alternatives" analysis. The Court reaches this conclusion with some hesitation, but adopts it both because the essential judgment call is here committed to

stormwater analyses set forth in the Amended Assessment are credited, the proposed action will not impact any wetland or floodplain sites. Def.'s Ex. D–2 at 432–37.

28. The Board of Governors, of course, had no way of appreciating their transgression since the Updated Assessment which was before them gave no indication of construction in a floodplain or wetlands. Indeed, it averred there would be no such construction.

the agency and because the Amended Assessment appears reasonable on its face.

(iii) The wetlands regulations' public notice requirements, sections 776.5(i) and 776.8, only require public notice of a proposed action's wetland/floodplain impacts *before* acquisition of the site when the proposed action involves construction in a floodplain or wetland. Since this Court has just held that the proposed action at the Smith Street site will not require constructing in a floodplain or wetland, this requirement is not applicable. Thus, the Postal Service has not violated the public notice provisions of its Part 776 wetlands regulations.

2. The Alleged Violations by the Postal Service of its Part 775 Environmental Regulations.

Waltham alleges that the Postal Service violated its own Part 775 environmental regulations in four ways:

i. it "pre-selected" the Smith Street site before completing its mandated environmental review;

ii. it failed to consider adequately in its three Environmental Assessments the alternative sites;

iii. it failed to solicit and consider adequately public input and to provide access to information concerning the site selection and environmental review process; and

iv. it used an impermissible factor, political feasibility, as a "primary factor" in its site selection.

The Court will address these allegations in the order they appear above.

(i) Waltham alleges that the Postal Service violated its own regulations, as well as NEPA, by "pre-selecting" the Smith Street site before completing its mandated environmental review. Waltham stresses that the Postal Service "controlled" the Smith Street site and acquired title to it before completing any environmental assessment on the site. The Postal Service does not deny this. However, the acquisition of title prior to completing the Environmental Assessment/FONSI process does not violate the Postal Service Part 775 environmental regulations or NEPA itself.

The Part 775 environmental review regulations contain no requirement that the Environmental Assessment/FONSI process be completed prior to taking title. *See* 39 C.F.R. § 775.6 ("Environmental evaluation process"). Nor does this Court interpret NEPA itself as requiring that the Environmental Assessment/FONSI process be completed before the taking of title. This Court adopts the analysis of Judge Lasker in *27.09 Acres I* that NEPA only requires that the review process be completed before an agency has made an "irretrievable commitment of resources" such that its decision to undertake construction is irrevocable. 737 F.Supp. at 283–84 (holding that the legal act of condemnation of a site by the Postal Service does not amount to an irretrievable commitment of resources requiring the completion of the Environmental Assessment/FONSI process). In the circumstances of this case that point had not been reached at least as recently as June 1991, the date of the issuance of the Amended Assessment.[29]

---

29. This in no way is to suggest that the Court accepts the Postal Service contention that the Environmental Assessment/FONSI process need not be completed until construction actually begins on the proposed site. The Court agrees with Judge Lasker in *27.09 Acres I* that "what constitutes an agency's commitment to a course of action must be determined according to the facts of each particular case." 737 F.Supp. at 283.

The Court simply rules here that the Postal Service Environmental Assessments, the last of which was completed in June 1991, did not violate the requirement that the review process be completed prior to "the irretrievable commitment of resources." In *27.09 Acres I,* Judge

Lasker ruled that neither a legal condemnation proceeding nor a declaration of taking constituted an irretrievable commitment of resources by the Postal Service. The court reasoned:

If, once the full NEPA process has run its course, the Postal Service decides not to build or is barred from building the [proposed facility], the Postal Service could resell the condemned land or use it for a different type of (and perhaps less environmentally damaging) postal facility.

*Id.* at 284.

Similarly, here it cannot be concluded that the Postal Service had made an irretrievable commitment of resources at the time it executed

■ If an agency waits to acquire title to, or an option on, a site until it completes its environmental review of that site, it runs a significant risk that the price of the site will rise in the interim or that the site will no longer be available. Thus, the decision by the Postal Service to enter into the conditional contract for sale of the Smith Street site after having done an initial environmental review of the three final sites was prudent and reasonable. The sale was conditioned on the completion by the Postal Service of its environmental review of the site. Pl.'s Ex. 4. Under the contract, the Postal Service in essence invested $500,000 to secure its rights to a site for a proposed facility which it expected ultimately would cost $86,000,000. Such a conditional contract does not amount to the sort of "irretrievable commitment of resources" that would require completion of the Environmental Assessment/FONSI process. *27.09 Acres I*, 737 F.Supp. at 283–84.

(ii) The City also alleges the Postal Service failed to consider adequately alternative sites. In support of this contention Waltham offers three facts:

(a) A Postal Service internal site committee identified the Smith Street site as the "preferred site" among the three final sites before the Postal Service had conducted its December 1989 Alternative Sites Environmental Analysis which reviewed the three sites.

(b) The Postal Service only reviewed alternative sites in its December 1989 Alternative Sites Environmental Assessment and not in any subsequent Environmental Assessment.

(c) Certain facts offered by the Postal Service to explain its selection of the Smith Street site as the best site in its December 1989 Alternative Sites Environmental Analysis were "plainly erroneous."

Before evaluating these contentions, the Court will summarize the process the Postal Service did follow and will briefly review the regulations relevant to Waltham's allegations.

The administrative record indicates that the Postal Service convened a site selection committee in August 1989 which narrowed the list of potential sites to three contending sites in Waltham and identified the Smith Street site as the "preferred site." Pl.'s Ex. 20 (September 5, 1990 Decision Analysis Report). The Postal Service then commissioned Rizzo Associates to conduct an Alternative Sites Environmental Analysis which was completed in December 1989. This Alternative Site Assessment examined the three sites in terms of seven issues: hazardous waste, traffic, wetlands, stormwater management, utilities, visual impact, and "special construction considerations." It concluded that the Smith Street site was the "preferred location." Pl.'s Ex. 1–D at 727. Subsequently, the Postal Service issued its Initial Assessment in May 1990, an Updated Assessment in September 1990, and its Amended Assessment in June 1991. All three Assessments evaluated environmental issues concerning the Smith Street site. The Updated Assessment included, as Volume 4, the December 1989 Alternative Site Assessment, but the other Assessments contained no analysis of alternative sites.

Two provisions in the Postal Service Part 775 NEPA regulations are relevant to determining whether its Environmental Assessment/FONSI process considered alternative sites as required. According to 39 C.F.R. § 775.6(b)(1):

The environmental assessment of any action which involves the choice of contending sites for a facility must be started early in the planning of the action. An environmental assessment report, however, is not required until the contending project sites have been determined. The information contained in the environmental assessment report must be used, together with other site planning information, in the selection of the final site.

In addition, 39 C.F.R. § 775.7(a)(3) states that an environmental assessment must contain "[f]or each reasonable alternative, a description of the affected environment, the environmental consequences, the miti-

the conditional sales contract, or at any time

before it completed its Amended Assessment.

gation measures, if any, and a comparison to all alternatives considered."

▇ (a) The fact that a site selection committee identified the Smith Street property as the "preferred site" may be in tension with the spirit of the above-stated regulations, but it clearly does not violate them. The site selection committee did not make a decision as to what the "final site" should be. Instead, as required by § 775.-6(b)(1), the Postal Service conducted an Alternative Site Assessment and used the information therein to determine the "final site." Furthermore, as required by § 775.-7(a)(3), the Alternative Site Assessment described the affected environments at the three sites, analyzed the respective environmental impacts and mitigation measures, and compared the environmental issues presented by the three contending sites.[30] Therefore, the Court concludes that the Postal Service Alternative Site Assessment does not violate the procedural requirements of 39 C.F.R. §§ 775.6(b) and 775.-7(a)(3).

(b) The fact that the Initial Assessment and the Amended Assessment contained no analysis of alternative sites also does not violate the letter of § 775.7(a)(3), although it too appears to be in tension with the spirit of the regulations. The Court views it as overly formalistic to isolate and evaluate each Assessment individually. The Alternative Site Assessment, the Initial Assessment, the Updated Assessment, and the Amended Assessment should be viewed as parts of the Postal Service extended environmental assessment process. Where the Postal Service, in December 1989, produced a 100–page Alternative Site Assessment comparing the three alternative sites, the Court concludes that it considered the alternative sites as required and need not further compare the alternative sites in the subsequently prepared assessments.

(c) Waltham also alleges that the Postal Service Alternative Site Assessment was inadequate because it relied on "plainly erroneous" information. Waltham contends that more accurate data reveals that an alternative site, the "Nelson" site, "would have a less detrimental effect on the environment with regard to the drinking water source, traffic congestion, noise pollution, wetlands, tax impact, zoning concerns, and other matters[.]" Complaint at ¶ 37. More specifically, Waltham contends that the Alternative Site Assessment's transportation analysis of the alternative "Nelson" site underestimated accessibility to that site because the Service incorrectly treated a potential access road (Fox Road) as a private road and did not account for Waltham's plans to improve certain other access roads. Furthermore, Waltham claims the Postal Service incorrectly assumed it planned to make improvements at the Trapelo Road—Smith Street intersection, thereby underestimating the access problems at the Smith Street site. Complaint at ¶ 29.

The Court has reviewed the Alternative Site Assessment, and Waltham's extra-record affidavits alleging its inadequacy. The Alternative Site Assessment clearly considered a broad range of issues in determining that the Smith Street site was the preferred location. It devoted much attention to environmental issues (hazardous waste, traffic, wetlands, stormwater management, and visual impacts), but also gave significant weight to issues of potential costs and time delays. *See* Pl.'s Ex. 1–D at 723–27. The Alternative Site Assessment's conclusion that the Smith Street site was the preferred location rested on a blend of environmental and financial factors. *Id.; see also,* Pl.'s Ex. 11 (Letter to Mayor Stanley from K. Perrin, General Manager, Postal Service Real Estate Division). The Court notes that the Alternative Site Assessment identified lower anticipated project costs at the Smith Street site relative to the other two sites, both of

---

**30.** The analysis of the three sites in the Alternative Site Assessment reveals neither great detail nor great depth. As the Court emphasizes *supra* at note 6 and accompanying text, however, an Environmental Assessment is not required to be as detailed and in-depth as an Environmental Impact Statement. The regulations promulgated by the Council on Environmental Quality to implement NEPA make clear that an Environmental Assessment is to be "a concise public document" which "briefly provide[s] sufficient evidence and analysis[.]" 40 C.F.R. § 1508.9.

which would require rock excavation, as a key consideration favoring the Smith Street site as the preferred location. *Id.* at 725–27.

NEPA and the Postal Service's own regulations require that alternatives be considered and that environmental issues be taken into account. They do not mandate a particular decisionmaking outcome. *See generally Robertson*, 490 U.S. at 350, 109 S.Ct. at 1846 ("It is ... well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process"). Nor is it this Court's role to substitute its judgment for the technical assessment of the agency. It does appear that the Alternative Site Assessment was in error regarding transportation access to the Nelson site. Nevertheless, given that the Alternative Site Assessment cited many factors to support the conclusion that the Smith Street site was the preferred location, the Court holds that this conclusion was not arbitrary and capricious. On the basis of the record and the extra-record affidavits before it, this Court concludes that the Postal Service adequately considered alternative sites.

(iii) Waltham also contends that the Postal Service "failed to solicit and consider information and views from local agencies, as required by 39 C.F.R. § 775.7(b) [and] failed to provide the public notice to local officials required by ... 39 C.F.R. § 775.10(a)(3)." Complaint at ¶ 41. The specific notice requirements of § 775.10 mandate that the Postal Service give public notice of hearings, of the intent to undertake an Environmental Assessment, and of the availability of an Environmental Assessment or a FONSI. Section 775.7(b) essentially requires that the Postal Service, in preparing an Environmental Assessment, solicit and consider the views of federal, state, and local agencies.[31] It must be stressed that these requirements obligate the Postal Service to notify local officials and consider their views; they do not obligate the Postal Service to agree with local views.

There is here some disturbing evidence that the Postal Service, at least with respect to this new facility, does not take sufficiently seriously its duties to communicate with and consider the views of local officials. The record and extra-record affidavits indicate that the Town of Lexington did not receive a formal notice of Postal Service intent to conduct an environmental assessment until that town actually received the May 1990 Initial Assessment. *See,* White Aff. at ¶ 6; Vidich Aff. at ¶ 5. Additionally, it is undisputed that having held a June 26, 1990 public hearing in Waltham on the Smith Street proposal, the Postal Service refused Waltham's request for another public hearing after the release of the Updated Assessment in September 1990. *See* Pl.'s Ex. 10 and 12. Further-

---

31. Section 775.7(b) states:

Those preparing an environmental assessment must solicit information and views from Federal, State, and local agencies and, where there is a substantial likelihood of significant effects on the environment, the public. All responsible views and information must be considered.

Section 775.10, "Public notice and information", states, in pertinent part:

(a) Public notice is given of NEPA-related hearings, intent to undertake environmental assessments and environmental impact statements, and the availability of environmental documents (that is, environmental assessments, findings of no significant impact, and environmental impact statements), as follows:

(1) Notices must be mailed to those who have requested them....

(3) Notices of any proposed action having effects primarily of local concern are given as follows:

(i) Any such notice, including a copy of any pertinent environmental document, must be mailed to the appropriate review officials identified in the Postal Service regulations and procedures governing intergovernmental review of Postal Service facility project actions, to the State Historic Preservation Officer, and to local public officials.

(ii) Any such notice must be published in one or more local newspapers.

(iii) Any such notice must be posted on or near any proposed or alternate sites for an action.

(iv) Any such notice may be mailed to potentially interested community organizations, including small business associations.

(v) Any such notice may be mailed to owners and occupants of nearby or affected property.

more, it is undisputed that on December 12, 1990, Waltham filed a Freedom of Information Request for documents related to the site selection and environmental review process and the Postal Service did not fully comply with this request until June 25, 1991. Postal Service Memorandum in Support of Motion for Summary Judgment at 2 n. 2.[32] Finally, the Postal Service has not denied that it acquired the Smith Street site on December 20, 1990 after telling Waltham at a December 3, 1990 meeting that the Smith Street site would not be acquired before February, 1991. Cervone Aff. at ¶¶ 23 and 32.

 While these acts and omissions reflect poorly on the Postal Service, most of them do not constitute violations of the Postal Service regulations. The failure to provide Lexington with notice prior to May, 1990, however, represents a violation of section 775.10(a)(3). Aside from this violation, the Court's review indicates that the Postal Service did fulfill its notification duties under section 775.10(a)(3). Waltham received from the Postal Service a March 16, 1988 Intergovernmental Review Notice related to consideration of the GSA site in Waltham and a November 1, 1989 Notice of Intent to Prepare an Environmental Assessment. Vidich Aff. at ¶¶ 3–5. In addition, neither Waltham nor Lexington disputes that it received notice of the Initial Assessment, the Updated Assessment, the FONSI and the Amended Assessment in a timely fashion.

Similarly, the Postal Service has complied in large part with the requirement of § 775.7(b) that, in preparing an Environmental Assessment, it solicit and consider the view of federal, state, and local agencies. The Court acknowledges that the record indicates the Postal Service did little to solicit and consider the views of local agencies between October and December

of 1989 while conducting its Alternative Site Assessment. *See* Vidich Aff., Exh. A. The record also indicates, however, that the Postal Service had significant contact with, and seriously considered the views of, local officials and residents from the May, 1990 release of the Initial Assessment until the June 1991 release of the Amended Assessment. The Court counts at least ten meetings between the Postal Service and Waltham officials, in addition to the June 1990 public hearing. *Id.*

Perhaps more importantly, both the Updated Assessment and the Amended Assessment clearly show that the Postal Service considered the input it received from Lexington and Waltham officials. The Updated Assessment made changes with respect to the evaluation of wetland, stormwater, noise, and traffic issues in response to the comments the Postal Service received in writing and at the public hearing regarding the Initial Assessment. Pl.'s Ex. 1–A at 8. In addition, the Updated Assessment presented and responded to all written comments the Postal Service received regarding the Initial Assessment, including written comments from the Waltham Traffic Commission and the Town of Lexington. Pl.'s Ex. 1–C. The Amended Assessment addressed wetland, traffic, and stormwater issues raised by local officials regarding the Updated Assessment and presented specific plan changes and mitigation measures clearly designed to respond to these concerns. Def.'s Ex. D–1 at 201.[33] In sum, the record shows that the Postal Service, albeit slowly and gracelessly, has considered local views as required under section 775.7(b).

The Court does not wish to condone the failure of the Postal Service to comply fully with its public input and public notice regulations. These matters are hardly "trivial

**32.** The Court notes, however, that Waltham has not alleged any violation of FOIA in its complaint.

**33.** In its Amended Assessment, the Postal Service completely altered its stormwater management plan in response to wetlands and stormwater issues raised by Waltham and Cambridge

Water Department officials. Def.'s Ex. D–1 at 226–38; Def.'s Ex. D–2. Similarly, it amended its traffic analysis and proposed alternative mitigation measures in response to Waltham's wetlands and traffic concerns. Def.'s Ex. D–1 at 208–25.

violation[s]".[34] Still, the record indicates no prejudicial error resulting from this non-compliance. These procedural inadequacies, therefore, cannot provide the basis for striking down the Environmental Assessment/FONSI process. *See, Project B.A.S.I.C. v. Kemp,* 721 F.Supp. 1501 at 1517 (D.R.I.1989) (Pettine, J.) (holding that agency's non-compliance with NEPA procedural requirements, while not "trivial", resulted in no prejudicial error and therefore did not render agency's challenged decision unlawful), *aff'd mem.,* No. 89–1910 (1st Cir. Oct. 5, 1989), *and remanded,* 907 F.2d 1242 (1st Cir.1990) (on unrelated grounds).

(iv) Finally, Waltham alleges that the Postal Service used an impermissible factor, political feasibility, as a "primary factor" in its site selection process. In support of this contention Waltham offers as its "smoking gun" evidence a one-page internal Postal Service document entitled "Political Feasibility". Pl.'s Ex. 3. The sheet compares the "Likely Problems/[Environmental Impact Statement] Potential" of the three final sites. It notes that, unlike the Smith Street site, the other two sites would have moderate to high impact on the Town of Weston, described as "a very affluent community (similar to Westchester towns)." It expresses concern over likely Weston opposition to either of these two sites and rates the Smith Street site as "low" with respect to "Likely Problems/[Environmental Impact Statement] Potential" whereas the other two sites are rated "moderate" and "moderate or high".[35]

The Postal Service contends the one-page "political feasibility" sheet was part of a 24 page briefing package prepared by Theodore Tarantino, Senior Real Estate Specialist, for a March 9, 1990 briefing meeting for the Postal Service Boston Division. According to the Postal Service, the 24 page package addressed environmental, financial, political, and operational issues affecting the three sites. Vidich Aff. at ¶ 9. In conclusory fashion, the Postal Service asserts that "the 200 Smith Street site was not selected primarily or otherwise because of political feasibility. The key factors ... were the operational acceptability of the sites, the real estate and construction costs and the environmental impacts, together with the costs and feasibility of any necessary mitigation measures." Vidich Aff. at ¶ 9.

■ The allegation that Postal Service decisionmaking was influenced by an impermissible political factor is a most serious one. The Postal Service explanation of when and for what purpose this "political feasibility" sheet was produced appears undisputed, however. By March 1990, when the "political feasibility sheet" was prepared, the Postal Service had already completed its Site Alternatives Assessment and targeted the Smith Street site as the "preferred location". In context, therefore, the supposed "smoking gun" actually has little

---

**34.** The regulations of the Council on Environmental Quality explicitly state that "trivial violations of these [NEPA] regulations do not give rise to any independent cause of action." 40 C.F.R. § 1500.3.

**35.** More specifically, the sheet assesses the Smith Street site as follows:

> This property lies entirely within the City of Waltham and borders on the Town of Lexington. Officials from both cities indicate little concern for a [general mail facility] at this site. There are approximately 12 residences across from the site.... These homes can be protected ..., yet those owners may still be expected to protest/oppose our facility at this location.

Second, it evaluates the "GTE site" this way:

> This site, and the proposed [general mail facility] ..., lies half in Waltham and half in Weston. Weston, a very affluent community

(similar to Westchester towns) is quite upset with GTE's unfulfilled promises. If our facility has the potential to impact Weston residents, both the town and its neighbors can be expected to strongly oppose us at this location.

Third, it offers the following analysis about the "Nelson site":

> While contained in Waltham, traffic from this location would impact the residential neighborhood along Stowe Street near the Rte. 20 interchange onto 128. Visually the facility would be seen from Weston and is likely to generate considerable opposition from Weston neighbors who would look up at the new [general mail facility] from their backyards. The Chairman of the Weston Planning Board lives next to the site and would insure a most thorough public review process.

probative value in demonstrating that political feasibility influenced the site selection process between September 1989 and February 1990. Where, as here, the administrative record indicates that the Postal Service decision was adequately grounded on a consideration of relevant factors (in other words, was not arbitrary and capricious), the preparation of a single sheet which considers an impermissible factor is, given the timing, insufficient to show the agency's bad faith and thereby justify the Court inquiring further.

3. Conclusion of the Court's Procedural Review: The Postal Service EA/FONSI Process Should Not Be Struck Down Based on Procedural Inadequacies.

The Court has examined carefully the procedures followed by the Postal Service in light of the applicable Part 775 and Part 776 environmental review regulations. The Postal Service Environmental Assessment/FONSI process complied with the requirements of the Part 776 wetlands regulations and complied in large part with the procedural requirements of its Part 775 environmental regulations. The Court does not condone the failure of the Postal Service to comply fully with the public input and notice requirements of the Part 775 regulations. No prejudicial error resulted from any procedural inadequacy, however. *See generally Project B.A.S.I.C.*, 721 F.Supp. at 1517. The Court holds that the Postal Service Environmental Assessment/FONSI process was not arbitrary and capricious and sufficiently complied with the procedural requirements of the Postal Reorganization Act and NEPA.

## V. COUNT III: THE INTERGOVERN-MENTAL COOPERATION ACT

█ In Count III of its Complaint, Waltham claims that the conduct of the Postal Service violated the Intergovernmental Cooperation Act ("ICA") and the Postal Service Part 778 regulations implementing the ICA. Section 401 of the ICA, codified at 31 U.S.C. § 6506, directs the President to prescribe regulations governing agency planning of federal projects which will have "a significant impact on area and community development." 31 U.S.C. § 6505(b). The Act requires that agencies planning such projects, "to the extent possible," consider national, regional, state, and local viewpoints. Executive Order 12372 issued pursuant to the ICA, requires all federal agencies to "provide opportunities for consultation" by elected officials of local governments directly affected by a federal project. Exec.Order No. 12372, § 1, 47 Fed.Reg. 30959 (1982), amended by Exec.Order No. 12416, 48 Fed.Reg. 15587 (1983). The Order also directs all federal agencies to promulgate regulations implementing the statute. Exec.Order No. 12372, § 5.

To implement the ICA, the Postal Service promulgated its Part 778 regulations, "Intergovernmental Review of Postal Service Facility Actions." 39 C.F.R. § 778 (1990). The Postal Service contends, however, that the ICA creates no right of action against it, arguing that section 410 of the Postal Reorganization Act exempts it from the ICA, and that its own Part 778 regulations express only a voluntary policy and therefore are unenforceable. To support this argument, the Postal Service relies on language in 39 C.F.R. § 778.1 which provides in pertinent part:

(a) The regulations in this part implement Executive Order 12372.... These regulations also implement applicable provisions of section 401 of the Intergovernmental Cooperation Act of 1968, which the Postal Service follows as a matter of policy.

. . . .

(c) These regulations are not intended to create any right or benefit enforceable at law by a party against the Postal Service or its officers.

In *City of Rochester v. United States Postal Serv.*, 541 F.2d 967, the Second Circuit addressed the identical argument by the Postal Service. The court reviewed the history and legislative intent behind the ICA and the Postal Reorganization Act. Applying the reasoning of *Chelsea Neigh-*

*borhood Ass'ns*, 516 F.2d 378, the court determined that the ICA was broad, "policy-oriented" legislation, and not the sort of managerial statute from which the Postal Service was exempt under the Postal Reorganization Act. Thus, the Second Circuit concluded:

> The ICA is a new developmental policy, passed by the Congress in October, 1968, only three months before the genesis of the Postal Reorganization Act. *Cf. Chelsea Neighborhood, supra*, 516 F.2d at 384. The Act simply cannot be characterized as one of the outmoded managerial statutes which the Postal Service was intended to be freed from by Section 410.... We conclude, therefore, that the Service must comply with the ICA requirements, unless we read the ICA as an exercise in meaningless legislative futility.

*City of Rochester*, 541 F.2d at 975. Furthermore, the Second Circuit ruled that a city showing that a proposed facility will cause environmental harm within that city's boundaries has standing to enforce the ICA against the Service. *Id.* at 972; *see also, Village of Palatine*, 742 F.Supp. 1377 (holding that Palatine could enforce the ICA and the Part 778 regulations against the Postal Service).

This Court agrees with the Second Circuit's conclusions and holds that the Postal Service must comply with the ICA and its own Part 778 regulations, and that Waltham has standing to enforce these provisions against it. The Court reads the ICA as imposing three essential requirements on the Postal Service. First, the Service must provide "opportunities for consultation" by the officials of local governments directly affected by its proposed action. 39 C.F.R. § 778.4(a). Second, the Service, "to the extent possible," must consider national, state, and local viewpoints in planning its new facility. 31 U.S.C. § 6506(c). Third, the Service must develop a reviewable record:

[T]he agency has an affirmative obligation to develop a reviewable record, including a list of the factors which support its decision to act in disharmony with local planning objectives, so that a reviewing court can determine whether the agency has acted arbitrarily or capriciously in claiming it has fully considered, but rejected local planning objectives. *See Harlem Valley Transportation Association v. Stafford*, 500 F.2d 328, 337 (2nd Cir.1974).

*City of Rochester*, 541 F.2d at 976.

These requirements are not meaningless. Serious violations of these requirements can justify enjoining the Postal Service from proceeding with its proposed action.[36] There are no such violations in this administrative record. Here, the record provided by the Postal Service provides an ample basis for the Court to review whether it acted arbitrarily or capriciously in claiming "it has fully considered but rejected local planning objectives." The record indicates that the Postal Service held numerous meetings and a public hearing with officials and residents of Waltham. Vidich Aff., Ex. A. The Updated and Amended Assessments respond directly to the criticisms and concerns raised by Waltham officials and residents at these meetings and in written correspondence. The Court acknowledges that the Postal Service refused to hold a second public hearing as requested by Waltham. Nevertheless, based on the record, the Court concludes that the Postal Service provided Waltham officials with an opportunity for consultation and considered Waltham's views to the extent possible.

█ It is less clear that the Postal Service fully complied with the requirements of the ICA with respect to the Town of Lexington. It appears Lexington received no notice of intent to prepare an Environmental Assessment and was first notified of the proposed Smith Street action in May, 1990, upon release of the Initial Assess-

---

**36.** The Second Circuit, in *City of Rochester*, 541 F.2d at 978–79, found sufficiently serious violations of the ICA by the Postal Service to justify granting an injunction against it. In *Village of Palatine*, 742 F.Supp. at 1396–98, the court found that such violations could justify injunctive relief against the Postal Service and therefore denied the motions of the Postal Service for dismissal and summary judgment.

ment. The record also indicates far fewer meetings between the Postal Service and Lexington officials. Nevertheless, the Updated Assessment responded to Lexington's traffic concerns by including key Lexington intersections in the traffic analysis. Lexington's sole objection at this point is that the Postal Service has not considered sufficiently the possible impact of truck traffic in Lexington. The Postal Service contends that further consideration of this issue is unnecessary because the design of the site and the rules governing most trucks serving the facility purport to assure that they will not drive through Lexington in going to or from the site. The ICA does not require the Postal Service to satisfy local concerns; it only requires that they be heard and considered. The Court rules that if the Postal Service violated the ICA with respect to Lexington, a point which need not be finally decided, any such violation resulted in no prejudicial error and cannot justify the granting of injunctive relief.

## VI. COUNT IV: THE CLEAN WATER ACT CLAIM

 The final count in Waltham's complaint alleges that the conduct of the Postal Service failed to comply with two provisions of the Clean Water Act, 33 U.S.C. §§ 1342 and 1344 (1988). Section 1342, entitled the "National Pollutant Discharge Elimination System" ("NPDES"), sets forth requirements and procedures for obtaining a pollutant discharge permit. Section 1344, entitled "Permits for Dredged or Fill Material," sets forth requirements and procedures for obtaining a permit allowing the discharge of dredged or fill material into navigable waters, which are defined to include wetlands.

Here again, analysis of the Amended Assessment makes clear that, at the time of the Board of Governors' vote to acquire the Smith Street site, the Postal Service had failed to comply with these provisions. The Standley Affidavit proffered by Waltham with its Complaint also suggests two other wetland concerns: (1) that the Postal Service stormwater plan involved placing a culvert between the isolated southerly wet-

land ("wetland A") and the adjacent wetland to the north ("wetland B"), and (2) that the southern access road would cross over a part of wetland B. Standley Aff. at ¶ 6. If the Amended Assessment is credited, however, these concerns are now fully addressed. The Amended Assessment asserts that the Postal Service has commenced the application process for an NPDES permit in accordance with 33 U.S.C. § 1342. Def.'s Ex. D–1 at 235. Also, as a result of the stormwater management and traffic design plan changes set forth in the Amended Assessment, the proposed action of the Postal Service does not require construction in wetlands or floodplain, nor does it involve discharging fill in wetlands. Def.'s Ex. D–1 at 204 and 205. Therefore, the Postal Service need not obtain a permit under section 1344. Moreover, the Amended Assessment asserts that there is no plan to place a culvert between wetlands A and B and that the south access road will entirely avoid wetland B. Def.'s Ex. D–1 at 229. Here too the factual underpinning for these conclusions must be viewed with skepticism as post-hoc rationalizations, but they are at least plausible on their face.

## VII. CONCLUSION

 The Court should issue summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court has closely scrutinized the administrative record, the after-the-fact Amended Assessment, and Waltham's extra-record submissions to determine whether any such genuine dispute of material fact exists. The Court concludes that the Postal Service has provided an administrative record sufficient to review the substantive and procedural adequacy of its Environmental Assessment/FONSI process. There are, therefore, no genuine issues of material fact.

This—the crucial conclusion—depends, of course, on accepting the findings of the Amended Assessment, and it is here that this opinion skates on the thinnest ice in view of the untimely and extra-record na-

ture of that assessment. Still, as developed in the text, a proper recognition of executive discretion vis a vis court review and a desire to avoid penalizing and frustrating an agency determination to engage in on-going environmental review warrants according the Amended Assessment the grudging support the Court has given it. To bolster the ultimate conclusion in the text, however, the Court expressly rules that the judgment entered herein is dependent upon the issuance of the NPDES permit, the implementation of the amended stormwater management and traffic design plan, and the avoidance of construction in floodplain or wetlands or the discharge of fill into wetlands as the Postal Service defines them in the Amended Assessment. The Court will retain jurisdiction as an equitable matter and, should any of these eventualities not occur, the Court will vacate the judgment and order further proceedings.

As matter of law, to prevail in its challenge of the Postal Service decision not to prepare an Environmental Impact Statement, Waltham must show a "substantial possibility that agency action 'could significantly affect ... the human environment.'" *Sierra Club v. Marsh,* 769 F.2d at 870 (quoting *Quinonez–Lopez,* 733 F.2d at 2. Based on the Court's review of the record and extra-record affidavits, it concludes that Waltham has not shown a substantial possibility of significant environmental impact. The Court holds, as matter of law, that the Postal Service decision to site the new facility at the 200 Smith Street site was not substantively arbitrary and capricious under the Administrative Procedure Act and was procedurally adequate under the Postal Reorganization Act and NEPA. Furthermore, the Court rules that the Postal Service action was adequate under the Intergovernmental Cooperation Act and the Clean Water Act.

Therefore, the motion of Waltham for summary judgment is DENIED and the motion of the Postal Service for summary judgment is ALLOWED.